

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-26-1995

# Gov't of the Virgin Islands v. Charles

Precedential or Non-Precedential:

Docket 94-7638

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"Gov't of the Virgin Islands v. Charles" (1995). *1995 Decisions.* Paper 317.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/317

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 94-7638

_____GOVERNMENT OF
THE VIRGIN ISLANDS

vs.

DALE CHARLES,
Appellant


On Appeal From the Appellate Division of the United States
District Court of the Virgin Islands, Division of St. Thomas
(D.C. Crim. Action No. 89-cr-00083)


Argued August 16, 1995

BEFORE:  STAPLETON, LEWIS and WEIS, Circuit Judges

(Opinion Filed  December 26, 1996)



W. Ronald Jennings
United States Attorney
Audrey Thomas-Francis (Argued)
Assistant U.S. Attorney
5500 Veterans Building, Suite 260
Charlotte Amalie, St. Thomas
U.S. Virgin Islands 00802
  Attorneys for Appellee

Thurston T. McKelvin
Federal Public Defender
Stephen A. Brusch (Argued)
Assistant Federal Public Defender
P.O. Box 1327
Charlotte Amalie, St. Thomas
U.S. Virgin Islands 00804
  Attorneys for Appellant




1

STAPLETON, Circuit Judge:

Dale Charles appeals from his convictions for murder in the first degree and for possession of a knife with intent to use it unlawfully. He raises three challenges to his convictions. First, Charles argues that he did not voluntarily and intelligently waive his right to counsel when the district court, after a hearing, granted Charles' request to represent himself at trial. Second, Charles asserts that the district court should have dismissed the information against him because the government conceded during plea negotiations that Charles was insane when the acts in question occurred. Third, Charles claims that there was insufficient evidence of deliberation and premeditation. We will affirm.

I.

In May 1989, Charles stabbed Dale Francois to death in an alley on the Island of St. Thomas in the Virgin Islands. Francois was unarmed. Apparently, when Francois entered the alley, Charles rushed Francois without provocation and stabbed him several times. The government of the Virgin Islands filed an information that charged Charles with first degree murder under 14 V.I.C. § 922(a)(1) and with possession of a knife with intent

2

to use it unlawfully against Francois during the commission of a crime of violence under 14 V.I.C. § 2251(a)(2).

In May 1990, after the defense persuaded the district court to allow Charles to withdraw a guilty plea, a defense expert, Arthur Stillman, M.D., undertook a psychiatric evaluation of Charles. Dr. Stillman concluded that "it seems doubtful that [Charles] could adequately assist his attorney in the preparation and presentation of his defenses [and i]t is quite clear that he cannot differentiate reality from fantasy. . . ." (App. at 51-52.) In addition, regarding Charles' state of mind when he stabbed Francois, Stillman opined that Charles "was suffering from a psychotic paranoid state and is considered to have been insane at that time." (App. at 52.) In November 1990, Michael W. Morrison, Ph.D., a court appointed expert, agreed:

> Mr. Charles is suffering from a mental illness that renders him unable to understand the nature and consequences of the proceedings against him and unable to assist properly in his defense. . . . Mr. Charles was severely mentally ill on [the day of the offense] and his use of a dangerous weapon to commit murder that day was a consequence of his mental illness.

(App. at 65-66.)[1]

In March 1991, the district court found Charles mentally incompetent to stand trial. By December 1992, Bruce Burger, M.D., of the Federal Bureau of Prisons found that Charles' condition had stabilized and that Charles was competent

---

[1] Under Virgin Islands law, "[a]ll persons are capable of committing crimes and offenses except . . . persons who are mentally ill and who committed the act charged against them in consequence of such mental illness . . . ." 14 V.I.C. § 14(4).

to stand trial.  In March 1994, Leighman Lu, M.D., a court appointed expert, and in June 1994, Michael Chiappetta, Psy. D., a defense expert, agreed that Charles was competent to stand trial.  Lu also found that Charles was not suffering from any disorder at the time of the offense.  Dr. Burger reevaluated Charles in June 1994, and once again found Charles competent to stand trial.  After a hearing on September 26, 1994, the district court found Charles competent to stand trial.  Jury selection was completed that afternoon and the trial began the next day.

Apparently, at some point before the September 26 hearing, the prosecution and the defense had reached an agreement.  Both parties would consent to a bench trial and would stipulate to all of the facts including the findings of Dr. Morrison, namely that Charles' actions were the result of his mental illness.  Presumably, what the parties had in mind was a finding by the district court of not guilty by reason of insanity, followed by automatic commitment to a psychiatric institution under 5 V.I.C. § 3637.  Had the government dropped the charges without the stipulation, Charles could have been involuntarily committed only in a proceeding under the general civil commitment statute.  That statute requires clear and convincing proof that the individual is a danger to society, and that treatment is likely to be beneficial.  19 V.I.C. § 723.

The agreement fell apart, however, when Charles decided that he did not want to raise the defense of insanity.  Rather, he decided to claim self defense and demand a jury trial.  The prosecution, which had no burden to produce evidence regarding

4

Charles' sanity at the time of the offense until Charles first presented some evidence of insanity, see Government of Virgin Islands v. Webbe, 821 F.2d 187, 189 (3d Cir. 1987), decided to proceed to trial. Charles' attorney, Stephen Brusch, convinced that he could not, on behalf of Charles, agree to the stipulation of insanity or raise the defense of insanity at trial without Charles' consent, moved to dismiss the information on the ground that the prosecution had effectively conceded that Charles was insane at the time of the offense. The district court concluded that Charles' mental state at the time of the offense was an issue for the jury and denied the motion.

At that point, Charles also decided that he no longer wanted Brusch to represent him. He wanted to represent himself at trial. Charles was convinced that Brusch was hostile to the idea of arguing self defense and Charles was concerned that Brusch, as an employee of the local government, had conflicting loyalties. At the hearing on September 26, 1994, after finding Charles to be competent to stand trial and after an extensive colloquy with Charles, the district court determined that Charles knowingly and intelligently waived his right to counsel. The district court granted Charles' motion to proceed pro se and appointed Brusch as stand-by counsel to assist Charles.

Charles presented his case to the jury during a two day trial. The jury convicted him on both counts and the district court sentenced him to life in prison without parole. The district court had jurisdiction under 48 U.S.C. § 1612. We have jurisdiction to hear this appeal under 28 U.S.C. § 1291.

II.

First, Charles argues that he did not knowingly and intelligently waive his right to counsel. The Sixth and Fourteenth Amendments guarantee the assistance of counsel to anyone accused of a serious criminal offense. See Government of the Virgin Islands v. James, 934 F.2d 468, 470 (3d Cir. 1991). Because a defendant who asks to represent herself is waiving the benefits associated with this important constitutional right, and because "courts [must] indulge in every reasonable presumption against waiver" of important constitutional rights, Brewer v. Williams, 430 U.S. 387, 404 (1977), a court cannot grant such a request unless the record shows that the relinquishment is "knowing and intelligent[]." Faretta v. California, 422 U.S. 806, 835 (1975) (quoting Johnson v. Zerbst, 304 U.S. 458, 464–65 (1938)).

In James, this Court provided some details regarding the scope of the Faretta inquiry that a court should undertake in response to a defendant's request to proceed pro se. First, the court must make an inquiry regarding the defendant's reasons for the request. James, 934 F.2d at 470–71. Second, the court should make sure that the defendant is aware of the dangers of self-representation. Specifically, the court should make a thorough and penetrating inquiry to determine whether the defendant understands the nature of the charges, the range of possible punishment, potential defenses, technical problems that the defendant may encounter, and any other facts important to a

6

general understanding of the risks involved. Id. at 471, 473. There is no rote speech that the court must recite. Rather, the proper inquiry depends on the particular facts and circumstances of the case, including the background, experience, and conduct of the accused. Id. at 473-74.

In order for a waiver of the right to counsel to be valid, the court must first assure itself that the defendant is competent to waive the right. Godinez v. Moran, 113 S. Ct. 2680, 2685 (1993). The competency necessary to waive the right to counsel is identical to the competency necessary to stand trial. Id. at 2685-86. The defendant must be able to consult with counsel and must have a rational and factual understanding of the proceedings. United States v. Renfroe, 825 F.2d 763, 766 (3d Cir. 1977). Since a competent defendant is entitled to make his or her own decision with respect to representation, it is irrelevant whether the defendant is capable of representing himself or herself effectively. Godinez, 113 S. Ct. at 2687.

We decide de novo whether the record demonstrates a knowing and intelligent waiver. United States v. Velasquez, 885 F.2d 1076, 1085 (3d Cir. 1989). However, regarding a colloquy between the defendant and the court, the issue of whether the defendant misunderstood what the court said, despite the defendant's unambiguous answers indicating comprehension, is a pure question of fact which depends primarily on the demeanor, conduct, and intonations of the defendant. We review a finding on this underlying factual issue under a clearly erroneous standard. See Miller v. Fenton, 474 U.S. 104, 112 (1985). We

7

review the district court's findings regarding the competency of the defendant for clear error. United States v. Velasquez, 885 F.2d 1076, 1089 (3d Cir. 1989).

Charles concedes that the district court conducted a sufficient inquiry. Indeed, the district court's inquiry was thorough and probing. However, Charles argues that he was not competent to waive the right to counsel and that his answers demonstrate that he did not understand the trial court's admonitions.

## A. Charles' Competency

At the outset of the hearing on September 26, the day before the trial began, the district court determined that Charles was competent to stand trial and thus to make all of the important decisions associated with trial. That decision was not clearly erroneous.

The district court based its finding of competence on the testimony and conduct of Charles at the September 26, 1994 hearing and on a July 11, 1994 report written by Dr. Burger. Dr. Burger saw Charles on a regular basis during his prior hospitalization and after he was readmitted for study on June 14, 1994. Dr. Burger concluded that Charles was capable of understanding the proceedings and the charges against him and had the ability to consult meaningfully with his counsel. Dr. Burger's report indicated that Charles "evidenced an excellent understanding of the roles and responsibilities of court officers as well as his own obligations and rights in a court situation."

8

(App. at 145.)  He was alert and fully oriented at all times. His cognitive abilities were in the low average range for an adult. Charles suffered from chronic paranoid schizophrenia and had experienced intermittent severe psychotic episodes in the past, but his schizophrenia was currently in remission.  Charles showed no symptoms of schizophrenia and was not taking medication.  When the district court asked each side whether it wished to contest the conclusions reached in Dr. Burger's report, neither Charles nor his counsel sought to do so.

We are mindful that Dr. Burger's report was two and one half months old when the September 26, 1994 hearing took place and that some of Charles' responses at the hearing were rambling.[2]  We cannot say, however, that Charles' responses as a

---

[2]  For example:

> THE COURT:  Now, why do you think you are more competent than counsel . . . ?
> CHARLES:  Your Honor, you might think I'm incompetent, if I tell you that.
> THE COURT:  Pardon?
> CHARLES:  I said, for what I might say to you, right, you might consider me incompetent.
> THE COURT:  I didn't say that.  I said, why do you think you are more competent than counsel.
> CHARLES:  I said, my answer to you would maybe make you think that I am incompetent.
> THE COURT:  Well, let me hear your answer.
> CHARLES:  Well, your Honor, growing up, my family, and there was, you know, fightings and things like that, where people of Mr. Brusch's descendants –– once a fourteen year old child or a sixteen year old child fight with my mother's husband, and no one tried to assist us, call the police, do anything, which in they were also the ones removed the gun from the place.
> So I don't, I don't know for sure what I am going through, what I am going through, and why Mr. Brusch is not in favor of me exposing all of these things that

9

whole were inconsistent with Dr. Burger's observations and opinions.  The district court observed Charles first-hand at the hearing the day before the trial began and was in the best position to observe Charles, evaluate his mental state, and determine whether a follow-up evaluation was necessary.  We decline to second guess the district court's determination.

### B.  Charles' Responses Concerning the Assistance of Counsel

Charles' responses to the district court's questions were sufficient to demonstrate that his waiver of the right to

---

> has happened here in The Islands, because of the government's inconcern [sic], unconcern, you know.
> And I have been pushed to the point where now someone is hurt by me having to protect me, and all criminal activities, the Police Department might be saying I've been involved in, that I would be framed, and the witnesses would say I did things that I did not do.
> *  *  *
> THE COURT:  In other words, you don't want the stipulation [of insanity].  You want to go to trial.  That's what you are telling me.
> CHARLES:  I want the stipulation, too, but still I want to make them pay.  I mean, to anything to get out, if I don't out by winning, and I get out by going to North Carolina, I be in the United States, even if I have to live the rest of my life in prison, that's okay with me.  But I want them to punish, you know, because they are supposed uphold the law now, not favoring nobody.  Everything is the white man --

(App. at 232-33, 248-48a.)

> Although rambling, when read in context, even these responses were not incoherent.  As Charles expressed throughout the hearing, he felt that the police and government had mistreated him and his family in the past, and he wanted to "make them pay" by exposing this at trial.  Charles wanted to tell his side of the story despite the risks:  "[E]ven if I have to spend the rest of my life in prison, that's okay with me."  (App. at 248-48a.)

10

assistance of counsel was knowing and intelligent.  Considering

Charles' history of mental illness and limited education, the

district court appropriately conducted an inquiry that was

especially thorough and probing.

First, the court made sure that Charles understood the

purpose of the hearing:

> THE COURT:  Now, I am going through a procedure here to determine whether or not you fully understand the consequences of your expressed desire to proceed with the representation of yourself --
> CHARLES:  Yes, sir.
> THE COURT:  -- and that you are doing that voluntarily and intelligently.  Do you understand that?
> CHARLES:  Yes, sir, very intelligently.

(App. at 227.)

Next, the court asked Charles why he was dissatisfied

with his appointed counsel.  Charles made clear that he was

concerned that his appointed counsel was hostile to the idea of

arguing self defense and that he wanted the public to know that

he was not insane:

> CHARLES:  Your Honor, my dissatisfaction is based upon being in the United States and speaking with doctors and prison officials and other people that has heard the nature of the offense and why it was committed, and they are totally in disagreement with Mr. Brusch's way of handling it, that I cannot win. They are stating that based upon my defense, they don't see why any attorney would resist presenting it.  And that is what it is based upon.
> Also, to the interest of the public, who I don't owe no explanation, but I still think I do, you know. I went to school here, and teachers and things like that, I have heard, "Well, Mr. Charles is charged with murder, and they think Mr. Charles is crazy and" --this and that.  I think I owe them an explanation to clear their mind of any doubt that I am anybody different to who they have known before.
> * * *
> CHARLES:  [My attorney] has never seen my side of the case.

11

THE COURT:  Well, I understand that's what you're saying.  But apparently, from what I also understand you are saying, was that he, in the course of representing you, made the observation to you that the procedure you are willing to follow, in his opinion, could not be in your best interest.  Isn't that what you are telling me?

CHARLES:  Yes. . . .  It might be, it might hurt -- it might hamper me, it might hurt me in the long run, but it's in the best of my interest, what I want to present.

(App. at 227-29.)

Next the court made sure that Charles understood that he was not as competent as an attorney:

THE COURT:  Well, certainly, you realize that you are not as competent as a lawyer would be, insofar as the rules of procedure --

CHARLES:  Yes.

THE COURT:  -- and in terms of meeting issues raised by the government.  Do you agree with that statement?

CHARLES:  Yes, but that's what I would like [Mr. Brusch] to sit there for.

THE COURT:  Pardon?

CHARLES:  Any issue that the government raises that I don't understand, that's what I'm going to have him there for.  He is going to work for me.

THE COURT:  In other words, you're the lawyer, but you are going to turn to him to assist you --

CHARLES:  When I don't understand something.

(App. at 231.)

Next the court established that Charles understood the government's burden of proof at trial:

THE COURT:  . . . It's the government's obligation and responsibility to prove you guilty beyond a reasonable doubt and, therefore, you are not required to prove or disprove anything.  Do you understand that?

CHARLES:  Yes I understand that.  I think I do.

(App. at 234.)

Next the court made sure that Charles understood the nature of the charges against him and of his defense:

12

THE COURT:  All right.  Now, do you understand the nature of the charges against you?

CHARLES:  Yes, sir.

THE COURT:  What are you charged with?

CHARLES:  First degree murder.

THE COURT:  Of whom?

CHARLES:  Mr. Dale Francois.

THE COURT:  And your defense to that is?

CHARLES:  My actions was done in self-defense.

THE COURT:  All right.  And you understand what self-defense means?

CHARLES:  Yes.  Preservation comes first.

THE COURT:  Pardon?

CHARLES:  Preservation, self-preservation comes first.

THE COURT:  All right.  Now, have you done any reading of the law in this area?

CHARLES:  What I have been with paralegals in the United States and I have learned a little bit, but I haven't done much reading about it.

THE COURT:  But you have discussed the case with them?

CHARLES:  Yes, sir.

THE COURT:  Have you read any legal decisions or any cases on the subject?

CHARLES:  Well, not really.  A little bit of investigation here and there, that, you know, it was pertinent in presenting my case.  But I don't even think I have to go through those books to win this case.

(App. at 234-35.)

Next the court made sure that Charles was aware of the possibility of pleading insanity:

THE COURT:  Now, you recognize, too, that Mr. Brusch has talked with you with respect to asserting an insanity or a mental illness defense?

CHARLES:  Yes, sir.

THE COURT:  And you have rejected that?

CHARLES:  Yes, sir.

THE COURT:  And you also understand, too, that there have been discussions, as you heard in the argument earlier today, that would -- could have brought about an agreement or a stipulation to present the matter to the Court for findings?

CHARLES:  Yes, sir.

THE COURT:  And those are not acceptable, that is not acceptable to you; is that correct?

13

> CHARLES: Not on the grounds they are presenting them with.
>
> THE COURT: The only thing that you would accept would be a dismissal of the case with prejudice?
>
> CHARLES: Yes sir.

(App. at 238-39.)

Next the court made sure that Charles understood that he would have to conduct the case in conformity with the Federal Rules of Evidence and the Federal Rules of Criminal Procedure, and that he understood the court's role regarding evidentiary issues:

> THE COURT: . . . You also realize that you are going to have to conduct your defense in the course of the Federal Rules of Evidence and Criminal Procedure? Do you understand that?
>
> CHARLES: Well, I really know about that part.
>
> THE COURT: Well, you are going to have to do that.
>
> CHARLES: Well, being that you are the judge, you know --
>
> THE COURT: Don't turn the tables on me. I'm just telling you.
>
> CHARLES: All right. I --
>
> THE COURT: These are your responsibilities. I'll take care of my responsibilities.
>
> CHARLES: Yes, sir.
>
> THE COURT: You have to assume your responsibilities. I want to make you aware of them.
>
> CHARLES: The only thing I don't -- I am aware of what you are saying, but what I am saying is, you know, what might be inadmissible to the prosecution, right, might be pertinent to my defense. So then, you would be the one would be left with the decision there.
>
> THE COURT: No, I will only rule, if the government goes ahead and enters certain evidence, if there is an objection to it, I will make a ruling.
>
> CHARLES: All right.
>
> THE COURT: If there is no objection, I will not make a ruling.
>
> CHARLES: All right, sir.

(App. at 239-40.)

14

Next, in a telling colloquy, Charles demonstrated that he understood that he lacked the knowledge of an attorney and that he was aware that this might hurt his case. However, he was willing to take that risk:

> THE COURT: Now, in order to make an objection, you certainly have to have some understanding of the Federal Rules of Criminal Procedure. Now, you may be hampered in presenting your best defense by your lack of knowledge of the law, and certainly the effectiveness of your defense may well be diminished by your dual role as a lawyer and the accused. Do you understand that?
>
> CHARLES: Yes. That's the chance I going to have to take. Those are the chances.
>
> * * *
>
> THE COURT: All right. So that you are well aware of all these problems, when you tell the Court that you want to proceed and conduct your own defense.
>
> CHARLES: Yes, sir.
>
> THE COURT: And you full understand the problems that will arise?
>
> CHARLES: No, sir.
>
> THE COURT: You don't understand the problems?
>
> CHARLES: All the problems, fully understand? Not fully, but --
>
> THE COURT: Well -- go ahead.
>
> CHARLES: -- basically, I do understand the proceedings. But I cannot understand fully of thinks [sic] that I know nothing about.
>
> THE COURT: Well, I certainly tell you, sir, that you are better off having counsel represent you fully. But you seem to be intent on representing yourself; is that correct?
>
> CHARLES: Yes, sir.
>
> THE COURT: And that Mr. Brusch's only position will be that of standby counsel --
>
> CHARLES: Yes, sir.
>
> THE COURT: -- is that correct?
>
> CHARLES: Due to the fact that he does not want to present the defense that I want to present.

(App. at 240-43.) When Charles explained that he did not fully understand all of the problems that could arise at trial, he was not, as Charles argues, demonstrating a lack of understanding of

15

the risks of representing himself.  On the contrary, his explanation showed a lucid understanding of the fact that he was not an attorney and could not anticipate every single problem that could arise.  <u>Faretta</u> does not require a defendant to be able to anticipate the details of every single problem that self-representation could cause.  Were this the standard, it would all but preclude anyone without a law degree from waiving the right to counsel.

Finally, the court made sure that Charles understood the penalty if he were convicted:

> THE COURT:  All, right.  Now, you recognize, too, do you not, that the penalty here is, if the jury does find you guilty of first degree murder, the Court has no choice, no leeway, the Court is compelled to sentence you to life in prison without parole?  Do you understand that?
>
> CHARLES:  Yes, sir.  And I hope that the Court will also send me to an American prison, where I can further my education, get out of St. Thomas, due to the fact that I can't trust no one here, not even to represent me in court.
>
> THE COURT:  Well, I can't do that, because in sentences here, if you are found guilty, you will be sentenced to the custody of the Bureau of Corrections, for whatever sentence is determined.  It is up to the Bureau of Corrections to determine what it wants to to [sic] in terms of where you will serve your sentence. I don't control that.
>
> CHARLES:  I am a United States citizen, not a Virgin Islander.
>
> THE COURT:  It doesn't make any difference.  You could be in Yugoslavia and found guilty of murder there, if you were so found, you would be sent to prison under the laws of Yugoslavia.
>
> CHARLES:  Yes, sir.
>
> THE COURT:  Just as you are here, you are sent to a prison under the laws of the Government of the Virgin Islands.

(App. at 244-45.)

16

Charles' responses indicate that Charles made his decision to represent himself with his eyes wide open. Despite, a few rambling answers, Charles unambiguously indicated that he understood the risks of self-representation as well as we could expect of him. He was aware that his lack of legal knowledge could hurt his case. He was aware that if convicted he would be sentenced to life in prison. Yet, he wanted to tell his side of the story. He believed that Mr. Brusch would not because Mr. Brusch wanted to argue insanity.

The district court believed that Charles comprehended what he was being told. It observed Charles first-hand and was in a far better position than we to evaluate his answers, including the ones in which he rambled. Its evaluation was not clearly erroneous. Even from our vantage point, however, given the questions and answers we have quoted above, we believe one could not conclude that Charles <u>failed</u> to understand unless one were prepared to conclude that he was <u>incapable</u> of understanding. As we have indicated, however, the district court credited Dr. Burger's opinion that Charles was able to understand the proceedings against him and that finding was not clearly erroneous.

C. Knowing and Intelligent Waiver

We accordingly accept the district court's factual findings that Charles was competent to stand trial and that he understood the information conveyed to him by the court. Based on those findings and independent review of the record, we

17

conclude that Charles' waiver of his right to counsel was knowing and intelligent.

## III.

Next, Charles argues that we should reverse the conviction and dismiss the information against him because the government conceded that he was insane at the time of the offense. As we understand Charles' argument, with the exception of the issue of premeditation which we address below, Charles acknowledges that there was sufficient evidence for the jury to return a verdict of guilty. Nonetheless, in light of the government's alleged concession, Charles asks us to set aside the government's inherently discretionary decision to continue with the prosecution.

"In our system, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute . . . generally rests in his discretion." Bordenkircher v. Hayes, 434 U.S. 357, 364 (1978). Only in rare cases can a court interfere with the government's decision to prosecute. For example, where a decision to prosecute is based on a defendant's race, religion, or decision to exercise a constitutional right, the courts must intercede. See e.g., Blackledge v. Perry, 417 U.S. 21, 27 (1974) (reversing a conviction due to retaliatory prosecution); United States v. Berrios, 501 F.2d 1207, 1211 (2d Cir. 1974) (setting out the elements of a claim of discriminatory prosecution).

There is no claim of discriminatory or retaliatory prosecution here, and we see nothing else that would warrant our intervention. While Charles claims that the government conceded that he was insane at the time of the offense, this mischaracterizes the record. It is true that at one point during negotiations, the government was prepared to stipulate to Dr. Morrison's conclusion that Charles was insane at the time of the offense. However, this stipulation was conditioned on Charles consenting to a bench trial and raising the insanity defense, thus exposing himself to a commitment under 5 V.I.C. § 3637. Because Charles refused to consent to the agreement, the government was not bound by the proposed stipulation.

Essentially what Charles is asking us to do is to prevent the government from prosecuting him because the prosecuting attorney may have subjectively believed that he was innocent by reason of insanity. Charles cites no authority, however, for the proposition that an otherwise valid criminal conviction may be overturned based on the prosecuting attorney's subjective belief regarding the guilt of the accused. Our own search has revealed none, and we decline to endorse that novel proposition.[3]

IV.

---

[3] It is, of course, not clear that the prosecuting attorney had an affirmative belief that Charles was insane at the time of the crime. She may well have believed that this was a litigable issue that might be lost and that, given the fact that the stipulation would result in Charles' commitment, the government's resources were better invested elsewhere.

19

Finally, Charles asserts that there was insufficient evidence for the jury to conclude that he committed a deliberate and premeditated killing. We review a claim of insufficiency of the evidence under a substantial evidence standard. We determine whether there is substantial evidence that, when viewed in the light most favorable to the government, would allow a rational trier of fact to convict. United States v. Aguilar, 843 F.2d 155, 157 (3d Cir.), cert. denied, 488 U.S. 924 (1988).

Section 992 of Title 14 of the Virgin Islands Code distinguishes between first and second degree murder in the following manner: "All murder which . . . is perpetrated by means of poison, lying in wait, torture or by any other kind of willful, deliberate and premeditated killing . . . is murder in the first degree. . . . All other kinds of murder are murder in the second degree." As this court explained in Government of the Virgin Islands v. Roldan, 612 F.2d 775, 781 (3d Cir. 1979), a brief moment of deliberation can suffice:

> To premeditate a killing is to conceive the design or plan to kill. . . . A deliberate killing is one which has been planned and reflected upon by the accused and is committed in a cool state of the blood, not in sudden passion engendered by just cause of provocation. . . . It is not required, however, that the accused shall have brooded over his plan to kill or entertained it for any considerable period of time. Although the mental processes involved must take place prior to the killing, a brief moment of thought may be sufficient to form a fixed, deliberate design to kill. . . .

In addition, as a practical matter, premedition can generally be proved only by circumstantial evidence:

> [S]ince [the defendant's mental processes] are wholly subjective it is seldom possible to prove them directly. If premeditation is found it must ordinarily

20

be inferred from the objective facts. Every sane man is presumed to intend all the natural and probable consequences flowing from his deliberate acts. . . . Accordingly, if one voluntarily does an act, the direct and natural tendency of which is to destroy another's life, it may fairly be inferred, in the absence of evidence to the contrary, that the destruction of that other's life was intended.

Id.

In this case, there was ample evidence from which the jury could have inferred deliberation and premeditation. An eyewitness testified that (1) Charles was sitting in the alley when Francois entered it; (2) Charles rose and rushed at Francois, grabbed Francois by his dreadlocks, and stabbed him repeatedly with a knife; and (3) preceding the attack there was no provocation by the victim or conversation between the two. Charles admitted that Francois was unarmed. The coroner's report indicated three stab wounds including a fatal stab wound to the chest. There was no evidence suggesting that the attack was initiated in the heat of passion.

The fact that Charles rushed at Francois immediately after Francois entered the alley does not preclude a finding of deliberation and premeditation. A brief moment of thought can be sufficient. Based on the use of a knife and the absence of any provocation or display of emotion by Charles, the jury could reasonably infer that Charles, in this brief moment, formulated a deliberate intent to kill Francois.

V.

21

For the foregoing reasons, we will affirm the judgment of the district court.

<u>Government of the Virgin Islands v. Dale Charles</u>
No. 94-7638


LEWIS, <u>Circuit</u> <u>Judge</u>, concurring.

This difficult case presents us with a window through which to view the r

world effects of the Supreme Court's decision in <u>Godinez v. Moran</u>, 125 L.Ed.2d 321

and it is not a pretty sight.  Charles' behavior at a hearing before the district c

left little doubt that he was prone to paranoid delusions and was unstable.  Howeve

because the Supreme Court has determined that the competency standard required to

knowingly and voluntarily waive one's right to counsel is the same as that required

defendant to stand trial and to represent him or herself, I am compelled to concur

the judgment of the majority.  I write separately to explain why I disagree with th

reasoning we are bound by in this case.

At the heart of the Supreme Court's holding in <u>Godinez</u> is the conclusion

defendant's competence to conduct his or her own defense is "not relevant" to a

determination of whether such a person is competent to knowingly and intelligently

his or her right to counsel.  The rationale supporting this conclusion presupposes

reality in which persons who may be marginally sane and barely competent to get thr

waiver of counsel hearing are nonetheless capable of trying their own cases.  Justi

Blackmun, in an insightful dissent, questioned the wisdom of the <u>Godinez</u> majority's

conclusion regarding the irrelevance of a defendant's competence to defend him or h

> It is obvious that a defendant who waives counsel must represent
> himself . . .  And a defendant who is utterly incapable of conducting
> his own defense cannot be considered "competent" to make such a

1

decision, any more that a person who chooses to leap out of a window in the belief that he can fly can be considered competent to make such a choice.

Godinez, 125 L.Ed.2d at 343 (Blackmun, J., dissenting).

In this case, it is abundantly clear from the record that Charles was not competent to conduct his own defense. This man has had a well documented history of mental illness. Indeed, it appears that Charles' decision to waive counsel, reject possibly valid defense and proceed on his own may itself have been the product of mental illness. In November 1990, a court appointed expert found Charles "unable to understand the nature and consequences of the proceedings against him and unable to assist properly in his defense . . . " App. at 65-66. He remained hospitalized, under observation, continued to receive treatment. Four years later, two experts separately concluded that Charles was mentally competent to stand trial. One expert concluded that Charles suffered from chronic paranoid schizophrenia, but was in remission. This expert also determined that Charles showed no signs of schizophrenia and was not taking medication. App. at Nevertheless, at the district court's colloquy to determine whether Charles was aware he was "voluntarily and knowingly" waiving his right to counsel, Charles repeatedly indicated that he was afraid that the Government of the Virgin Islands, the citizens of the Virgin Islands, and his defense attorney were conspiring against him.[4] His par

_____

[4] For example, when the district court asked Charles whether he understood that, agreed to the defense of not guilty by reason of insanity on stipulated facts, the might find him not guilty by reason of mental illness and commit him for evaluation the possibility of a return to society, Charles responded:

> Your honor, the whole thing with all of them, right, they afraid of me for what they have done to me . . . The whole thing about the government, the prosecutor, they all -- not the prosecutor, really, they haven't physically done me anything -- but the government, of itself, is afraid of me.

2

behavior at this critical juncture revealed that he is an individual who remains pr[...] periods of incoherent, delusional thought. It is true, as Judge Stapleton points o[...] that at times Charles was lucid and coherent in his responses to the district court[...] questions. However, his delusional statements demonstrate that his seemingly cohe[...] responses to the court's questions were hardly indicative of his overall mental cap[...] Certainly, at the very least, his delusional tendencies exposed the sad fact that h[...] utterly incompetent to effectively conduct his own defense.

I cannot agree that merely because a defendant is competent to waive cou[...] _fortiori_, he or she is also competent to act as counsel and to try the case, for it[...] obvious to me that a prerequisite to a determination of competence to waive counsel[...] searching evaluation of the degree to which one actually is capable of and competer[...] try one's case. The Supreme Court in <u>Godinez</u> suggests that a knowing and intellige[...] waiver ends the inquiry, as if everything else that follows is logical, rational,[...] reasonable and presumed. I think, again, that whether a person is, in fact, compet[...] waive counsel depends in part upon whether he or she is competent to represent him[...] herself, and that these are two distinct issues which must be separately evaluated.[...] latter is obviously relevant to the former, and there are any number of issues uni[...] different types of cases which prove this point.

Let's assume, for example, that Charles was charged with a series of intr[...] and complex tax fraud counts which had taken three years to investigate, had invol[...] hundred thousand pages of documents, and had required the appointment of a special[...]

App. at 246.

3

prosecutor with considerable expertise in this area. Under the <u>Godinez</u> Court's reas

all of this is "not relevant" to whether Charles was competent to waive counsel.

words, it doesn't matter that Charles obviously is not competent to actually repres

himself; the only question is whether he is lucid enough to make it through a collo

to waive his right to counsel. So long as he is, according to the Court, he is rea

able to try his case. There is no need to look any deeper because, after all, duri

colloquy Charles was able to punctuate his random incoherences with a few moments o

apparent lucidity and to answer the right questions satisfactorily. This, accordi

the Court, automatically renders him fit to try his murder case and, presumably, wo

have rendered him fit to try the hypothetical tax fraud case, too. The end result

almost always preordained. It is hardly surprising, then, that Charles and many ot

similarly situated -- some of whom might have reasonable insanity defenses or other

avenues of defense to pursue -- usually wind up either on death row or serving life

sentences.

In cases such as these, I believe that the trial judge should be required

further; to conduct another competency evaluation to determine a defendant's capaci

represent him or herself, including weighing various characteristics unique both to

defendant and to the case. A defendant who waives his or her Sixth Amendment right

counsel should not be left naked and unprotected by the Constitution. The Due Proc

Clause of the Fourteenth Amendment is supposed to prevent the government from obtai

criminal conviction through a procedure that fails to meet the standards of due pro

law. The Supreme Court has recognized that "[u]nless a defendant charged with a ser

offense has counsel able to invoke the procedural and substantive safeguards that

4

distinguish our system of justice, a serious risk of injustice infects the trial it

When a State obtains a criminal conviction through such a trial, it is the State th

unconstitutionally deprives the defendant of his liberty." Evitts v. Lucey, 469 U.

396 (1985), quoting, Cuyler v. Sullivan, 446 U.S. 335, 343 (1980). The fact that a

defendant acts as his or her own counsel does not alter the nature of his or her du

process rights.

But it would appear that the Court in Godinez ignored the fundamental due

process protections afforded to a defendant at trial, regardless of whether he or s

waived his or her Sixth Amendment right to counsel. After Godinez, defendants like

Charles, who have knowingly and voluntarily waived their right to counsel, are left

in their efforts to defend themselves, regardless of their competency to do so.

Nevertheless, because I am bound to follow Godinez, I must vote with the majority.

district court determined that Charles was competent to stand trial and that he kno

and voluntarily waived his right to counsel. The district court was in a better po

to evaluate Charles' mental state and to discern whether Charles understood the

implications of presenting his own defense. The court conducted its colloquy in

accordance with the requirements of Faretta v. California, 422 U.S. 806 (1975), and

that Charles met the Godinez standard for competence. There is simply not enough i

record to disturb this finding.

This case highlights the immense responsibility placed upon a district co

conducting a Faretta hearing. In Government of the Virgin Islands v. James, 934 F.

471-73 (3d Cir. 1991), we determined that a court conducting a Faretta hearing must

a thorough and penetrating inquiry to determine whether the defendant understands t

5

nature of the charges, the range of possible punishment, potential defenses, techni

problems that the defendant may encounter, and any other facts important to a gener

understanding of the risks involved."  Given that the Supreme Court has determined

defendant's competency to conduct his or her own defense is not relevant to whether

defendant has knowingly and voluntarily waived his or her right to counsel, distric

courts ought to be particularly vigilant in assuring that a defendant understands e

what he or she is waiving in a Faretta hearing.  The Faretta hearing, in this case

many future cases, was and will be the last procedural safeguard available to a men

unstable but "competent" defendant who mistakenly believes he or she can effectivel

his or her own case.

The Supreme Court has long recognized that the Sixth and Fourteenth Amend

guarantee that a person brought to trial in any state or federal court must be affo

the right to the assistance of counsel before he or she can be validly convicted an

punished by imprisonment.  See Gideon v. Wainwright, 372 U.S. 335 (1963); Johnson v

Zerbst, 304 U.S. 458 (1938); Powell v. Alabama, 287 U.S. 45 (1932).  Through its ho

in Faretta and Godinez, the Court has defined this right in such a way that require

allow a paranoid, delusional defendant to elect to represent himself at trial, purs

ill-advised defense, and ultimately be sentenced to life imprisonment.  That this r

is constitutionally permissible is deeply disturbing and ultimately "impugns the in

of our criminal justice system."  Godinez, 125 L.Ed.2d at 344 (Blackmun, J., disser

6