

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-30-2003

# USA v. Jackman

Precedential or Non-Precedential: Non-Precedential

Docket No. 02-2027

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"USA v. Jackman" (2003). *2003 Decisions.* Paper 337.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/337

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

<u>NOT PRECEDENTIAL</u>

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 02-2027
_____

UNITED STATES OF AMERICA

v.

DONALD G. JACKMAN, JR.

Appellant

_____

On Appeal From the United States District Court
For the Western District of Pennsylvania
(D.C. No. 00-cr-00072)
District Judge: Honorable Maurice B. Cohill, Jr.
_____

Submitted Under Third Circuit LAR 34.1(a)
July 10, 2003

Before: NYGAARD, SMITH, <u>Circuit Judges</u>, and IRENAS,
<u>District Judge</u>*

(Filed : July 30, 2003)

_____

OPINION OF THE COURT
_____

      *  Honorable Joseph E. Irenas, Senior United States District Judge for the District
of New Jersey, sitting by designation.

SMITH, Circuit Judge.

I.    Introduction

On April 12, 2000, a grand jury sitting for the Western District of Pennsylvania returned a two count indictment against defendant Donald G. Jackman, Jr. Count one charged Jackman as a felon in possession of twenty firearms in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1). Count two charged Jackman with violating 26 U.S.C. §§ 5861(d) and 5871 by knowingly possessing a destructive device which was not registered to him in the National Firearms Registration and Transfer Record as required under 26 U.S.C. § 5841. Jackman challenges his conviction as to count two, contending that the prosecution failed to establish that he had the requisite intent. Count two, Jackman also asserts, should have been dismissed because the government failed to preserve exculpatory evidence and because there was prosecutorial misconduct. In addition, Jackman submits that the District Court erred in several respects in sentencing him. We do not agree and will affirm the District Court's judgment.

II.    Facts and Procedural History

According to count two of the indictment, the destructive device consisted of "a cardboard tube approximately 6 inches in length containing explosive powder, encased in metal roller bearings, with an ignition fuse[.]" It is undisputed that the device, referred to as an improvised explosive device ("IED"), was made from a pest control device ("PCD") sold on the commercial market to deter geese and other wildlife by making a loud noise

2

when its fuse is ignited. The PCD had been altered by adding an explosive powder

Pyrodex into an empty chamber and by gluing roller bearings to the outside of the PCD.

The IED was seized, pursuant to a warrant, from the basement of Jackman's

girlfriend's home and placed in a "frag" bag for safekeeping after law enforcement

authorities detected the presence of a "powder line" inside the device.[1] At the request of

the Bureau of Alcohol, Tobacco & Firearms ("BATF"), Officer Wessel with the

Allegheny County Police Department removed the powder in the IED to render the device

safe and so that it could be sent to a laboratory for analysis. The powder was removed by

drilling into the end of the device opposite from the fuse. The components were sent to

the BATF for analysis. Thereafter, the BATF returned the disassembled device, as well

as the residue from the chamber to which the Pyrodex had been added. Photographs were

taken of the device and its various components at different stages during its disassembly.

The powder, subsequently identified as the explosive Pyrodex, however, was never

weighed.

Numerous pretrial matters, including a motion by the defense to determine

Jackman's competency, caused trial to be delayed. The District Court ordered a

psychiatrist, Dr. Bernstein, to conduct an examination and evaluation of Jackman.

Pursuant to a request by separate counsel appointed to represent Jackman during the

pendency of this motion, a second psychiatrist, Dr. Wettstein, was also directed to

---

[1]A suspected explosive device is placed in a "frag" bag so that it will contain any
fragmentation in the event the device explodes.

3

examine and evaluate Jackman. After a hearing on the motion to determine competency, the District Court found Jackman competent, granted the Public Defender's motion to withdraw and appointed defense counsel to represent Jackman.

The District Court ordered that trial be bifurcated, because a single trial on both counts one and two would have resulted in the jury being aware of Jackman's past criminal record. The court elected to first proceed to trial on count two. Before *voir dire*, defense counsel had moved to dismiss count two of the indictment, contending that the government's failure to preserve certain evidence warranted dismissal. Photographs, counsel acknowledged, had been provided of the destructive device before it was disassembled, but the prosecution had neither preserved nor quantified the contents of the alleged explosive device. Counsel argued that the IED had been destroyed in bad faith because the government disassembled it before law enforcement authorities were even sure that the IED violated the law.

The prosecution denied that it had recklessly spoiled the evidence. It pointed out that the IED had been disassembled to render it safe. While the Pyrodex had been removed from the IED, the prosecution pointed out that defendant had access to photographs of the device in various stage of its disassembly, copies of the laboratory analyses, the remnants of the IED, as well as other components of the device for analysis. Exemplars of the PCD that was altered, the prosecution noted, were also available commercially for the defense to examine. The District Court denied the motion, citing

4

the government's need to render the device safe and to determine whether the device was unlawful.

At trial, BATF Explosives Enforcement Officer Lund, *inter alia,* testified that the underlying commercial PCD was not illegal. The IED seized from Jackman's residence was illegal because it was designed to fragment upon explosion and such fragmentation had the potential to cause injury. However, at the close of the evidence, Jackman again moved to dismiss the indictment as to count two based on spoliation of the evidence, and made several other objections. The District Court denied these motions.

The jury returned a verdict of guilty as to count two. Thereafter, Jackman pled guilty to the firearms offense charged in count one. At sentencing, Jackman objected to the presentence report and sought several downward adjustments and departures. The District Court denied Jackman's motion and sentenced him to a term of imprisonment of 262 months at count one, to run concurrent with 120 months at count two.

Jackman filed a timely appeal. The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. We exercise jurisdiction under 28 U.S.C. § 1291 and we review Jackman's sentence pursuant to 18 U.S.C. § 3742(a).

III.    Sufficiency of the Evidence as to Possession of a Unregistered Destructive Device

Jackman alleges that the prosecutors failed to demonstrate that Jackman's device was not made for a legitimate use, *i.e.*, to scare geese. Having thus failed, the prosecution could not show that it had been redesigned for use as a weapon. With respect

5

to Jackman's sufficiency of the evidence challenge, our review is "highly deferential." *United States v. Helbling*, 209 F.3d 226, 238 (3d Cir. 2000). "We determine whether there is substantial evidence that, when viewed in the light most favorable to the government would allow a rational trier of fact to convict." *Government of the Virgin Islands v. Charles*, 72 F.3d 401, 410 (3d Cir. 1995).

We have held that intent is not a required element for proving the existence of a "destructive device" under 26 U.S.C. § 5845. *See United States v. Urban*, 140 F.3d 229, 234 (3d Cir. 1998). Rather, "the question of the possessor's intent is relevant only when the objective characteristics of the device demonstrate that it may not be a weapon." *United States v. Johnson*, 152 F.3d 618, 627 (7th Cir. 1998). Here the objective evidence before the jury indicated that the device found was a weapon, even if it was not intended as such. Expert testimony established the presence of explosive mixtures and explosives in the device, some of which were added to the commercially available device. Roller bearings were affixed by epoxy to the outside of the device and evenly spaced to provide for uniform fragmentation. This had the potential to cause injury or death.

Nonetheless, the prosecution *did* introduce circumstantial evidence of intent, negating Jackman's purported reason for fashioning the device. Jackman's girlfriend, with whom he was then living, testified that Jackman often fed cracked corn to geese at the pond, that the geese did not give off the odor that purportedly motivated him to build the device, and that Jackman had even told her that he could not hurt an animal. We

6

believe this evidence, especially when considered in light of the substantial discretion afforded to the juries who actually see and hear the testimony of the parties and witnesses and can thereby more properly judge their credibility, is sufficient to support Jackman's conviction.

IV.     Spoliation of the Evidence

Jackman challenges the prosecution's "destruction" of the device in question. In *California v. Trombetta*, 467 U.S. 479, 489 (1984), the Supreme Court held that the government's duty under the due process clause to preserve evidence is limited to evidence that possesses both "an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." Four years later, in *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988), the Supreme Court held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." Thus, under *Youngblood* and *Trombetta*, a defendant must show that the government "(1) acted in bad faith when it destroyed the evidence, which (2) possessed an apparent exculpatory value and, which (3) is to some extent irreplaceable." *United States v. Femia*, 9 F.3d 990, 993-94 (1st Cir. 1993).

Accordingly, the "presence or absence of good or bad faith by the government will be dispositive." *Id.* at 994. Bad faith, as *Youngblood* instructed, "turn[s] on the police's

knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." 488 U.S. at 56 n.1; *see Trombetta*, 467 U.S. at 488 (observing that the record did not contain any allegations of official animus toward the defendant or a conscious effort by the police to suppress the exculpatory evidence).

Here, Jackman contends that the government's destruction of the cardboard tube by drilling into it and the failure to weigh the contents of the Pyrodex deprived him of the opportunity to test the evidence to determine that it was, in fact, a destructive device in violation of the law. The government's bad faith, according to Jackman, was evident from the fact that it "destroyed the potentially exculpatory evidence at a time when it did not even know whether the IED violated federal law."

The legal conclusions underlying the District Court's denial of Jackman's motion to dismiss count two of the indictment based on the destruction of evidence are subject to plenary review. We review the factual findings for clear error. *United States v. Driscoll*, 852 F.2d 84, 85 (3d Cir. 1988); *see also United States v. Wright*, 260 F.3d 568, 570 (6th Cir. 2001) (review of motion to dismiss for failure to preserve exculpatory evidence subject to de novo review).

Jackman's argument is not persuasive. Under *Youngblood*, Jackman had to demonstrate bad faith, *i.e.*, knowledge by the police "of the exculpatory value of the evidence at the time it was . . . destroyed." 488 U.S. at 56 n.1. No such showing has been made. Instead, Jackman simply relies on the sequence of events surrounding the

8

IED's seizure and incapacitation to establish bad faith. This sequence of events, without more, fails to demonstrate bad faith, an official animus towards Jackman or even a conscious effort to frustrate Jackman's defense. Accordingly, the District Court appropriately denied Jackman's motion to dismiss count two of the indictment.

Because the prosecution met its burden of proof by introducing evidence regarding the design of the destructive device and because it was not required to prove intent, *see supra*, § III (citing *Urban*, 1440 F.3d at 234), Jackman cannot demonstrate that the evidence possessed an apparent exculpatory value. Moreover, Jackman fails to recognize that while the IED's intact cardboard tube and the weight of the Pyrodex were no longer available, there was ample evidence at his disposal for analysis. Such evidence included not only similar commercially available PCDs constructed of cardboard tubes, but also the remains of the IED after it was disassembled, the photographs of the IED and its components taken during various stages of its disassembly, and the commercially available PCDs, Pyrodex, epoxy and roller bearings. Because the PCD was commercially available, similar PCDs could have been analyzed to determine the strength of the cardboard tube, the dimensions of the empty chamber in the PCD, the volume of the empty chamber in the PCD, and the quantity of powder required to fill the empty chamber. As a result, Jackman cannot satisfy the third prong of the *Trombetta Youngblood* test, that is, that he was unable to obtain comparable evidence by other reasonably available means. *Trombetta*, 467 U.S. at 489.

9

V.    Prosecutorial Misconduct

In her opening statement, the prosecutor stated that "the [it]ems themselves about which you will hear testimony . . . are explosives or chemicals used to make explosives devices. Those are the types of things, I'm sure you'll understand, you may not necessarily get to see in the courtroom . . . ." Jackman alleges that this statement was prejudicial because it purportedly suggested to the jury that the Judge had already decided an element of the crime, specifically that these materials were explosives, to Jackman's detriment.

Viewing the prosecutor's comment in the "context" of the overall trial, *United States v. Zehrbach*, 47 F.3d 1252, 1265 (3d Cir. 1995), we believe that Jackman was not "unfairly prejudiced" by these remarks. *United States v. Young*, 470 U.S. 1, 11-12 (1985). First, the inference that Jackman would have us believe the jury drew from the prosecutor's isolated statement is tenuous at best. One wonders whether such a thought even crossed a juror's mind. Nonetheless, Jackman's counsel had the opportunity to explain "that the Court's policies are that we, [*sic*] whenever there is an allegation of something that is dangerous, whether it is or not, it can't be brought into the courtroom." Furthermore, Jackman's counsel himself referred to the powder in question as "explosive powder" during the trial. In fact, Jackman essentially conceded the powders had "explosive" qualities, but asserted that the powder was not present in sufficient *quantities* to actually create a harmful explosion. As noted *supra*, there is no question that the

10

prosecution produced sufficient evidence to prove the IED was a destructive device under

§ 5845(f). There was no prosecutorial misconduct.

VI.     The District Court's Sentencing Decisions

Finally, Jackman challenges certain aspects of the sentence imposed by the District

Court. First, Jackman argues that the District Court erred in denying him several

downward departures from the sentence called for by the Guidelines. He asserts he was

entitled to a departure on account of his diminished mental capacity under U.S.

Sentencing Guidelines Manual § 5K2.13. Furthermore, he asserts that the Guidelines

calculation significantly over-represented his criminal history, entitling him to the

departure available under Guidelines § 4A1.3.

Where a district court is aware that the Guidelines grant it the authority to depart

downward under the circumstances, but exercises its discretion and chooses not to, "we

have no jurisdiction to review its decision." *United States v. Powell*, 269 F.3d 175, 179

(3d Cir. 2001). The record reflects that the District Court was aware that Jackman had

some mental issues,"suggest[ing] that he be placed where he can receive mental health

counseling" in his sentencing order. Nonetheless, at sentencing, and in denying the

departure available under § 5K2.13, the District Court specifically stated Jackman had not

"successfully borne the burden of establishing a significantly reduced mental capacity by

a preponderance of the evidence." In response to Jackman's counsel's assertion that the

Guidelines overstated Jackman's criminal history, the District Court stated:

11

Well, with respect to the criminal history, there were some minor offenses in there, but I counted, in the presentence report, seven convictions and twelve other – so-called other arrests as they are called in the presentence report, and five of those he was found guilty, some were dismissed, but certainly he's got a lengthy and numerous criminal history.

Because the record demonstrates that both of these decisions were based on the District Court's view of the evidence before it that Jackman did not deserve these departures, we lack jurisdiction to consider the merits of Jackman's arguments.

Jackman also asserts that his case "fall[s] outside the heartland of cases" which have adequately been taken into consideration by the Sentencing Commission in formulating the guidelines. *Koon v. United States*, 518 U.S. 81, 98 (1996). Responding to the Supreme Court's decision in *Koon*, the Sentencing Commission adopted § 5K2.0, now explicitly recognizing this basis for departure. *See* U.S. Sentencing Guidelines Manual § 5K2.0, cmt. (2001). Unlike his other arguments, which are based on an assertion that the District Court erred in failing to grant a departure for which the Guidelines specifically provide, Jackman argues that the District Court erred in failing to recognize that the specific facts of his case are so "atypical" that the Guidelines as a whole do not cover the particulars of his case. *Koon*, 518 U.S. at 99-100. Jackman argues that his "objectively reasonable" belief that his actions were legal, caused by the combination of his purportedly diminished mental capacity and his receipt of a certificate from North Carolina supposedly restoring his rights of gun ownership, makes this an "unusual" case calling for a departure from the applicable Guideline. *Id.* The Supreme

12

Court has stated that, generally, "[t]hese considerations are factual matters." *Id.* at 100.

Although the District Court did not specifically discuss its ability to depart downward pursuant to Guidelines § 5K2.0 in its sentencing colloquy, the District Court plainly rejected the suggestion that there was anything "atypical" about Jackman's case, precluding its ability to depart downward under the Guideline. *See id.* at 100. As noted, the District Court did not believe that Jackman had "a significantly reduced mental capacity." Furthermore, the District Court did not believe that the purported restoration of Jackman's rights was significant because, on its face, the certificate did not apply to an individual in Jackman's circumstances. To emphasize this point, the District Court specifically took time at the end of the sentencing hearing to read into the record the certificate from the State of North Carolina purportedly restoring Jackman's right to own firearms. This certificate contained a specific "exception of the right to own, possess, receive, buy or otherwise acquire firearms" placing felons on notice that such rights may continue to be precluded for a period of five years. Jackman's arrest occurred just over three years after the date on this certificate.

Because the District Court rejected the "particular factor[s]" that Jackman contends "make the case atypical," *Koon*, 518 U.S. at 100, the record reflects the District Court's belief that there was nothing unusual about Jackman's case. Therefore, Jackman's case could not permit the application of the "heartland" exception to downward depart. Because these predicate findings are not clearly erroneous, the District

13

Court's refusal to grant this departure will be affirmed.

Finally, Jackman argues that although his case went to trial on count two, after the jury convicted him, he accepted responsibility for and pled guilty to count one. Jackman contends the District Court erred in denying him the corresponding two-level reduction in his base offense level. We review the denial of a downward adjustment for acceptance of responsibility for clear error. *United States v. Muhammad*, 146 F.3d 161, 167 (3d Cir. 1998). "In practice, the 'clearly erroneous' standard requires the appellate court to uphold any district court determination that falls within a broad range of permissible conclusions." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 400 (1990).

After the jury convicted Jackman on count two, he pled guilty to count one. Nonetheless, the record indicates that Jackman pled guilty to count one not because of the sudden onset of a feeling of responsibility, but merely because he felt he could not win. In his final statement to the District Court, Jackman never accepted any responsibility for his conduct. He claimed that things had been "twisted" against him and attributed his illegal possession of the firearms to the government's failure to inform him "if a purchase I made puts me in violation of the law." The record indicates that the District Court's denial of that reduction was entirely appropriate.

VII.    Conclusion

The judgment of the District Court will be affirmed.

14

TO THE CLERK:

Please file the foregoing Opinion.

BY THE COURT:

 /s/ D. Brooks Smith
Circuit Judge

Date: July 30, 2003