**STEVE TYSON, Appellant/Plaintiff**

**v.**

**PEOPLE OF THE VIRGIN ISLANDS, Appellee/Defendant**

S. Ct. Crim. No. 2011-0055

Supreme Court of the Virgin Islands

July 18, 2013

393

LEONARD B. FRANCIS JR., ESQ., Law Offices of Leonard B. Francis Jr., St. Thomas, USVI; SAMUEL A. WALKER, ESQ., TEELUCK PERSAD, ESQ., · CPLS, P.A., Orlando, Florida, *Attorneys for Appellant.*

PAUL J. PAQUIN, ESQ., Deputy Solicitor General, St. Thomas, USVI, *Attorney for Appellee.*

HODGE, *Chief Justice*; CABRET, *Associate Justice*; and SWAN, *Associate Justice.*

## OPINION OF THE COURT

(July 18, 2013)

HODGE, *Chief Justice.* Steve Tyson appeals from a July 22, 2011 Judgment and Commitment of the Superior Court of the Virgin Islands. For the reasons that follow, we will affirm all of Tyson's convictions except his conviction for felony murder under count 5 of the charges brought against him, which we reverse, and will remand the matter for resentencing in compliance with title 14, section 104 of the Virgin Islands Code.

## I. STATEMENT OF RELEVANT FACTS AND PROCEDURAL POSTURE

The People of the Virgin Islands[1] charged Tyson with several crimes stemming from a shooting incident that occurred on July 12, 2010, near Coki Point Beach, St. Thomas, resulting in the deaths of Shaheel Joseph Jr., who was walking to a burial service for a friend, (J.A. 61-62),

---

[1] In his appellate brief, Tyson contends that the Superior Court lacked jurisdiction to adjudicate the case. He asserts that the "People of the Virgin Islands" is "an entity whose existence is not recognized by law," and that the prosecution should have been brought in the name of the "Government of the Virgin Islands." (Appellant's Br. 37-39.) This argument, however, is wholly without merit, since, in 2005, the Legislature enacted the Omnibus Justice Act of 2005, Act No. 6730, section 35 of which amended title 3, section 114(a)(3) of the Virgin Islands Code to provide that "[t]he Attorney General shall have the following powers and duties: . . . to prosecute *in the name of the People of the Virgin Islands*, offenses against the laws of the Virgin Islands." (emphasis added). We therefore reject Tyson's argument that prosecuting him in the name of the People of the Virgin Islands was improper.

and L.P.C.[2] who was visiting St. Thomas on a cruise ship with her family to celebrate her fifteenth birthday. (J.A. 62-63.) L.P.C. was struck by a bullet while riding as a passenger in an open safari taxi leaving an underwater observatory located in the Coki Point Beach area. (J.A. 62-64.) At trial, the People presented testimony from several eyewitnesses, including Sean Penn, a resident of Coki Point. (J.A. 73.) Penn testified that he was in his front yard on the date in question, approximately ten to twelve feet from the road where the shooting took place. (J.A. 73-74, 76.) He observed Tyson drive down the road towards the beach in a red Honda car and then park "just there sitting down" for about 30 minutes before travelling back up the road. (J.A. 77-87.) Penn testified that he knew Tyson through his family, had known him "pretty much all of his [Tyson's] life," and also knew him by the nickname, "CeJo." (J.A. 75.) As Tyson drove back up the road from where he had parked, Penn observed a man — later identified as Joseph — walking down the road with a couple of other people. When they got near Tyson's car, he saw Tyson reach from the driver's seat across the passenger side, point a gun out of the window, and fire shots. (J.A. 91-94.) Penn stated that "the guy [Joseph] looked like he turn[ed] back and came towards the car and he got shot." (J.A. 94.) As the shooting progressed, Penn observed the red car at the entrance of the gate and saw at least two other persons exchange gunfire with Tyson, after which Tyson exited the red vehicle and ran away on foot. (J.A. 96-97, 126.) Penn did not see Joseph fire any shots, but stated that when Joseph fell to the ground, a gun fell out of his hand. (J.A. 130.) Penn also claimed he heard screams coming from a nearby safari taxi. (J.A. 97.) Penn noted that everyone "of the younger generation" attending the funeral was wearing red and black, including Joseph, and that it looked like something gang-related was going on. (J.A. 114-15, 119.)

Shanice Smith, one of the individuals walking down the road with Joseph when he was shot, testified that she, Joseph, and his older brother were walking down the road to the grave site for a funeral. (J.A. 133-42.) She was talking to Joseph when she heard shots behind them, and she turned to see Joseph fall to the ground. (J.A. 142-43.) She did not see

---

[2] Despite her death, we nevertheless protect the identity of the minor victim by use of her initials — "L.P.C." — in place of her name, consistent with our rules. *See* V.I.S.Ct.R. 15(c)(2).

Joseph fire a gun, did not see anything in his hands, and did not see the red car. (J.A. 145-46.)

Ceferino Perez Mendez — L.P.C.'s father — testified that he was in a safari taxi bus with his daughter when he saw a person in a red car firing shots at the person who was walking by, and that he saw that person fall to the ground. (J.A. 448.) He then saw someone come to help the person on the ground and observed the person in the red car firing more shots. (J.A. 449-50.) As these events were occurring, Perez Mendez heard his daughter say, "Oh my God, dad, they hit me" — she had been shot and died on the way to the hospital. (*Id.*)

Detective Allen Lans, one of the officers who reported to the scene after the 9-1-1 call, testified to collecting .40 caliber spent bullet casings, .45 caliber spent bullet casings, and 9 millimeter Luger spent bullet casings at the scene of the crime. (J.A. 278-79, 286, 289.) Dr. Francisco Landron, the medical examiner, testified that his autopsy findings showed Joseph was killed by a 9 millimeter projectile and L.P.C. was killed by a .38 caliber projectile. (J.A. 312-17.) There were no .38 caliber spent bullet casings discovered at the crime scene. (J.A. 324, 1146-1158.) Detective Lans also testified that he recovered an overloaded .40 caliber Glock magazine from Joseph's pocket. (J.A. 250-51.) He further testified to finding the red Honda car at the crime scene and noted that it had sustained several gunshot bullet holes. (J.A. 225-26, 247-49, 265-66.) Additionally, forensic science technical advisor Alfred Schwoeble, who testified as an expert in gunshot residue analysis, stated that the interior of the red Honda vehicle "was definitely in the environment of gunshot residue" and that "gunshot residue [was] present all over the interior of [the] vehicle." (J.A. 415-16.)

Tyson testified in his own defense and admitted to being at the Coki Point scene on the date and time in question. (J.A. 580-83.) He testified that as he was leaving Coki Point, he heard gunshots and felt bullets hit his car. (J.A. 585-86.) He stated that because a safari bus was in front of his car and he could not move due to traffic, he exited the vehicle and ran up the hill. (*Id.*) He stated that he did not know Joseph and never had any problems with him. (J.A. 585-86.) Tyson further testified that he did not own a firearm, nor had he ever fired a gun in his life. (J.A. 589.) On cross-examination, however, Tyson admitted that on December 6, 2010, he was convicted of the felonies of third-degree assault, and of having

used a firearm during the commission of that assault. (J.A. 609-609.)[3]

On rebuttal, the People introduced testimony from Detective Lans, and forensic science consultant Maurice L. Cooper, who was a witness in the People's case-in-chief but had been previously unavailable, regarding evidence from Tyson's December 6, 2010 third-degree assault conviction case. (J.A. 39, 460.) Specifically, Detective Lans testified that he collected two Winchester 9 millimeter Luger spent bullet casings and also photographed Tyson's red Honda car at the crime scene of the prior assault case. (J.A. 734-39.) Cooper testified that he compared the bullet casings recovered from the scene of Tyson's prior assault case to the 9 millimeter bullet casings recovered from the Coki Point scene, and this analysis revealed that the casings in both cases were fired from the same firearm. (J.A. 821.) Specifically, he testified that "[t]he firing pin impression and breech face marks had sufficient characteristics to indicate that they were fired in the same firearm." (Id.)

On April 19, 2011, a jury found Tyson guilty of all seven counts — first-degree murder for the death of Joseph, first-degree assault for shooting Joseph, first-degree murder for the death of L.P.C., three counts of unauthorized use of an unlicensed firearm during the commission of a crime of violence pertaining to each, and reckless endangerment in the first degree. (J.A. 12-24, 969-70.) The Superior Court merged the first-degree assault conviction into the first-degree murder conviction pertaining to Joseph, and did the same with the corresponding firearms charges. As to the remaining charges, the Superior Court sentenced Tyson to life imprisonment without parole for each first-degree murder conviction, fifteen years for the two remaining firearms charges, and five years for reckless endangerment.[4] The Superior Court recorded Tyson's sentence in a Judgment and Commitment, entered on July 22, 2011, from which he timely appealed.[5]

---

[3] The Joint Appendix is numbered incorrectly — the information referenced falls on what is numbered as J.A. 609 (Trial Tr. Vol. II at 272), and ends on what is numbered as J.A. 609 (Trial Tr. Vol. II at 274). Presumably, the pages that follow are off by two, in that the second "609" should have been "611."

[4] The Superior Court also imposed fines of $25,000 each for the two remaining firearms charges, but suspended the total amount of the fines imposed. (J.A. 17-18).

[5] The Superior Court judge pronounced sentence from the bench on July 1, 2011. Eleven days later, Tyson filed his Notice of Appeal, in which he stated that he wished to appeal from "the

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

"The Supreme Court [has] jurisdiction over all appeals arising from final judgments, final decrees or final orders of the Superior Court, or as otherwise provided by law." V.I. CODE ANN. tit. 4, § 32(a). Because the Superior Court's July 22, 2011 Judgment and Commitment constitutes a final judgment, this Court possesses jurisdiction over Tyson's appeal. *See, e.g., Potter v. People*, 56 V.I. 779, 787 (V.I. 2012) (noting that in a criminal case, a written judgment containing the adjudication of guilt and the resulting sentence is a final judgment for purposes of 4 V.I.C. § 32(a)).

This Court's consideration of the Superior Court's application of law is plenary, while findings of fact are reviewed for clear error. *St. Thomas-St. John Bd. of Elections v. Daniel*, 49 V.I. 322, 329 (V.I. 2007); *see also People v. John*, 52 V.I. 247, 255 (V.I. 2009) (quoting *United States v. Shields*, 458 F.3d 269, 276 (3d Cir. 2006)), *aff'd*, 654 F.3d 412, 55 V.I. 1324 (3d Cir. 2011). We review the Superior Court's evidentiary decisions for abuse of discretion. *Corriette v. Morales*, 50 V.I. 202, 205 (V.I. 2008). Where an appellant raises an issue for the first time on appeal, this Court will review for plain error. V.I.S.CT.R. 4(h); *Phipps v. People*, 54 V.I. 543, 546 (V.I. 2011).

When reviewing a claim of insufficient evidence, we view all issues of credibility in the light most favorable to the People and will affirm where "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Mendoza v. People*, 55 V.I. 660, 666-67 (V.I. 2011); *Latalladi v. People*, 51 V.I. 137, 145 (V.I. 2009); *see also Mulley v. People*, 51 V.I. 404, 409 (V.I. 2009) (quoting *United*

---

sentence entered by the Court on July 1st, 2011." (J.A. 20.) The Court then memorialized the sentence it had imposed in the written Judgment & Commitment, entered on July 22, 2012. We have held in many prior cases that, "in a criminal case, [the] written judgment embodying the adjudication of guilt and the sentence imposed based upon that adjudication constitutes a final [and appealable] judgment for purposes of 4 V.I.C. § 32(a)." *McIntosh v. People*, 57 V.I. 669, 678 (V.I. 2012) (collecting cases). As a result, Tyson's Notice of Appeal was filed prematurely. Nevertheless, we have explained that "[a] notice of appeal filed after the announcement of an order or judgment, but before the entry of a writing memorializing same, is treated as if filed on the date of and after entry and is considered timely filed even though it is premature." *Fontaine v. People*, 56 V.I. 571, 576 (V.I. 2012) (quoting *Shoy v. People*, 55 V.I. 919, 924 n.2 (V.I. 2011)) (internal quotation marks and alteration omitted); *see* V.I.S.CT.R. 5(b)(1).

*States v. Carr*, 25 F.3d 1194, 1201 (3d Cir. 1996)) ("[Evidence] need not be 'inconsistent with every conclusion save that of guilt, so long as it establishes a case from which a jury could find the defendant guilty beyond a reasonable doubt.' ")

## B. Sufficiency of the Evidence

On appeal, Tyson contests the sufficiency of the evidence on several grounds. We address each claim of insufficiency in turn.

### 1. *Murder in the First Degree — Joseph*

The People charged Tyson with Joseph's murder pursuant to section 922(a)(1) of title 14 of the Virgin Islands Code, which provides that "[a]ll murder which . . . is perpetrated by means of poison, lying in wait, torture, detonation of a bomb, or by any other kind of willful, deliberate and premeditated killing," constitutes first-degree murder. Tyson argues, for the first time on appeal, that the People failed to prove the premeditation necessary for first-degree murder, because the evidence did not establish any interval of time for him to have "conceived a design to kill." (Appellant's Br. 27.) He disputes the People's suggestion that he was waiting for Joseph, arguing instead that the evidence shows he did not know and had never seen Joseph prior to the day of the incident. (*Id.*)

▮ ▮ This Court has defined premeditation as "the deliberate formation of and reflection upon the intent to take a human life [involving] the mental process of thinking beforehand, deliberation, reflection, weighing, or reasoning for a period of time, however short." *Nicholas v. People*, 56 V.I. 718, 732 (V.I. 2012) (quoting *Brown v. People*, 54 V.I. 496, 506-07 (V.I. 2010)). Thus we have stated that

> [t]o premeditate a killing is to conceive the design or plan to kill. A deliberate killing is one which has been planned and reflected upon by the accused and is committed in a cool state of the blood, not in sudden passion engendered by just cause of provocation. It is not required, however, that the accused shall have brooded over his plan to kill or entertained it for any considerable period of time. Although the mental processes involved must take place prior to the killing, a brief moment of thought may be sufficient to form a fixed, deliberate design to kill.

*Codrington v. People*, 57 V.I. 176, 189-90 (V.I. 2012) (quoting *Brown*, 54 V.I. at 507). Premeditation can be demonstrated by circumstantial evi-

dence, suggested by any number of factors. *See Nicholas*, 56 V.I. at 732 (noting that such factors may include, among others, "the nature of the weapon used, lack of provocation . . . [and] the nature and number of the victim's wounds") (quoting *Brown*, 54 V.I. at 506-07).

■ In this case, Penn's testimony that he observed Tyson drive down the road toward Coki Beach, "park up" and sit there for around 30 minutes before driving back up the road to sit in traffic "idling" for about two to three minutes, then "[l]ean over in the passenger seat[,] . . . point a gun through the window" and shoot as Joseph and two others walked past, was sufficient to permit a rational jury to find beyond a reasonable doubt that Tyson reflected for a period of time before shooting Joseph; whether it was for the 30 minutes he sat parked, the two to three minutes he sat in traffic, or the moment in which he spotted Joseph and decided to arm himself with a firearm, reach across the passenger seat to point his gun out of the vehicle and fire shots at him. (J.A. 77-87, 92-93.) As noted in *Nicholas*, all that is required is some moment of reflection, however short. 56 V.I. at 732. Perez Mendez also corroborated Penn's testimony, as he recounted seeing a person in a red car firing gun shots. (J.A. 448-50.)

Furthermore, considering the circumstances that Tyson was already present on the scene when Joseph arrived and there was no conversation between the two or evidence of provocation from Joseph prior to Tyson shooting, a rational jury could find premeditation beyond a reasonable doubt.[6] *See Nicholas*, 56 V.I. at 732; *Gov't of the V.I. v. Charles*, 72 F.3d 401, 410-11, 33 V.I. 361 (3d Cir. 1995). According to Penn, "[t]raffic was coming down and up and [Tyson] was just idling in the road" when Joseph walked down the hill. (*See* J.A. 86, 92-93.) The three persons walking past Tyson's car were "[j]ust walking and talking," and after shots were fired, Joseph "turn[ed] back," suggesting that he was not

---

[6] Notably, Tyson's conduct could also constitute "lying in wait" and thus satisfy the elements of first-degree murder without resort to any finding of premeditation. *See Codrington*, 57 V.I. at 185-86 ("Because the statute [14 V.I.C. § 922] lists four examples as specific ways to commit first degree murder and then states that 'any other kind of willful, deliberate and premeditated' murder is also first degree murder, a murder accomplished through one of the four enumerated methods does not require a willful, deliberate and premeditated showing."). This theory, however, was never charged in the Information — Tyson was charged in Count 1 of the First Amended Superseding Information with willful, deliberate, premeditated murder. (J.A. 12.)

facing Tyson at the time Tyson began shooting. (*See* J.A. 93-94.) Likewise, Smith testified that she heard shots coming from behind them and then turned and saw Joseph fall to the ground, also indicating a lack of provocation. (J.A. 142-43.) *See Nicholas*, 56 V.I. at 736 (highlighting the lack of argument and the circumstance that the victim was shot from behind as indicators of premeditation); *see also Szuchon v. Lehman*, 273 F.3d 299, 319 (3d Cir. 2001) (noting that victim was shot twice in the back as a factor in establishing defendant's specific intent to kill).

■ The People also submitted testimony from Dr. Landron, who performed the autopsy on Joseph, which indicated that Joseph died from a gunshot wound to his neck, caused by a bullet that entered from the back of his neck. (J.A. 185-86.) The nature of the wound in this case, that the bullet entered Joseph from behind, could also support a rational jury's finding of premeditation. *See Nicholas*, 56 V.I. at 732. Accordingly, as to the alleged insufficiency of the evidence to prove premeditation, we do not find the jury's determination constitutes error,[7] let alone plain error.[8]

### 2. Felony Murder — L.P.C.

■ L.P.C., a passenger in a safari taxi bus that was waiting in traffic near Coki Point Beach at the time of the shooting incident, was killed by an errant bullet, which the evidence suggests was fired by someone other than Tyson[9] when the shooting erupted. Tyson was convicted of felony murder for her death, but argues there was insufficient evidence to support the conviction because the People did not prove beyond a reasonable

---

[7] We acknowledge that Tyson testified that he never fired any shots at all, and that he did not even know Joseph. (J.A. 582-83, 585-86, 589.) However, as we emphasized in *Mulley*, we must view the evidence in the light most favorable to the People, and sustain a conviction so long as the evidence permits a rational jury to find the defendant guilty beyond a reasonable doubt. *Mendoza*, 55 V.I. at 666-67; *Mulley*, 51 V.I. at 409.

[8] In his appellate brief, Tyson also contends that the People introduced insufficient evidence with respect to his conviction for assault in the first degree. The Superior Court, however, merged the assault conviction — which related to the shooting of Joseph — with the corresponding first-degree murder conviction. Thus, our holding that the People introduced sufficient evidence to sustain Tyson's conviction for murdering Joseph renders it unnecessary for us to review the sufficiency of the evidence of the assault conviction. *See State v. Beebe*, 131 Conn. App. 485, 27 A.3d 26, 33 (2011) ("[I]t is settled in our appellate jurisprudence that the effect of the trial court's merging of two convictions . . . is to forbear the defendant from challenging on appeal the evidentiary sufficiency of the merged offense.").

[9] L.P.C. was killed by a .38 caliber projectile, while Tyson was demonstrated to have used a 9 millimeter gun. (J.A. 312-17, 734-39, 821.)

doubt that L.P.C. was killed "in the perpetration" of his assault in the first degree on Joseph. (Appellant's Br. 33.) Specifically, Tyson argues there is no evidence that her death was connected to his actions.[10] *Id.* Importantly, the parties have not brought to our attention, nor has our research uncovered, any reported case applying the Virgin Islands felony murder statute to a death occurring under circumstances such as those involved in the killing of L.P.C. — a scenario in which neither the defendant nor an accomplice was alleged to have committed the murder, but rather a third party is implicated. Instead, the felony murder statute in the Virgin Islands has consistently been used to prosecute defendants for deaths occurring in the perpetration — by the defendant or an accomplice — of one of the felonies specified by 14 V.I.C § 922(a). *See, e.g., Gov't of the V.I. v. Carmona*, 422 F.2d 95, 96-97, 7 V.I. 441 (3d Cir. 1970) (concerning a homicide committed by the defendant during a robbery); *Gov't of the V.I. v. Albert*, 89 F. Supp. 2d 658, 665-67, 42 V.I. 184 (D.V.I. App. Div. 2000) (murder allegedly committed by appellant's accomplice during burglary). The trial court did not appear to appreciate that the felony murder charge against Tyson was factually unique, distinguishing this case from any other case previously tried under the Virgin Islands felony murder statute.

Jurisdictions that have adopted a felony murder statutory provision have generally taken either the "agency" approach — the majority view; or the "proximate cause" approach — the minority view. *See State v. Sophophone*, 270 Kan. 703, 19 P.3d 70, 74 (2001); *State v. Canola*, 73 N.J. 206, 374 A.2d 20, 29 (1977). Under the agency theory, only "those killings committed by the felon or his or her agent or accomplice" fall within the purview of felony murder; whereas, a defendant may be held liable for "any death proximately resulting from [his] unlawful activity" under the proximate cause theory.[11] *Sophophone*, 19 P.3d at 74.

---

[10] Tyson advanced a similar argument when he orally moved for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 after the People rested its case, but before he presented his defense. (J.A. 462-66, 472-74.) Accordingly, we exercise our discretion to review this claim *de novo* rather than for plain error. *See* V.I.S.CT.R. 4(h); *see also Tindell v. People*, 56 V.I. 138, 150 n.12 (V.I. 2012) (discussing this Court's appellate jurisdiction).

[11] Although Tyson argued during his Rule 29 Motion that whoever shot L.P.C., if returning gunfire, would have committed a justifiable homicide for which Tyson should not have been charged, Tyson did not refer to or specifically advance the agency theory of felony murder. (J.A. 463-64, 472-74.) *See, e.g., Sophophone*, 19 P.3d at 76-77 (holding that the defendant

The rationale behind the agency theory was most famously set forth in *Commonwealth v. Redline*, 391 Pa. 486, 137 A.2d 472, 476 (1958), in which the court noted,

> [i]n adjudging a felony-murder, it is to be remembered at all times that the thing which is imputed to a felon for a killing incidental to his felony is *malice* and *not the act of killing*. . . . It is necessary . . . to show that the conduct causing death was done in furtherance of the design to commit the felony.

*See also State v. Campbell*, 89 Mass. 541, 544, 7 Allen 541 (1863) ("No person can be held guilty of homicide unless the act is either actually or constructively his, and it cannot be his act in either sense unless committed by his own hand or by someone acting in concert with him or in furtherance of a common object or purpose."). Alternatively, courts adopting the proximate cause approach have opined that the application of the felony murder doctrine should be broad, reasoning that a defendant should be held liable for any death proximately caused by his felonious act, as the rule seeks to deter the commission of violent felonies. *See People v. Klebanowski*, 221 Ill. 2d 538, 852 N.E.2d 813, 821-22 (2006); *see also Forney v. Indiana*, 742 N.E.2d 934, 938 (Ind. 2001) ("[T]he felony murder rule applies 'when, in committing any of the designated felonies, the felon contributes to the death of any person.' . . . [I]t matters not whether the death caused is that of the intended victim, a passerby or even a co-perpetrator."); *Moore*, 580 S.W.2d at 752 ("The significant factor is whether the death was the natural and proximate result of the acts of the appellant or of an accom-

---

could not be charged with a death resulting from the lawful actions of one attempting to apprehend the felons under the agency theory). In response, the People cited to *State v. Moore*, 580 S.W.2d 747 (Mo. 1979), which advances the proximate cause theory, *see id.* at 752-53, and argued that death caused by a gunshot fired by a third party could still constitute felony murder where foreseeable — specifically, the People took the position that without Tyson's initial gunshots, return gunshots would not have been fired. Moreover, the People contended that Tyson's first-degree assault on Joseph was ongoing, as he continued to fire shots as he fled the scene. (J.A. 468-71.) Nonetheless, the People, likewise, did not explicitly reference the proximate cause theory of felony murder. Still, considering both parties presented arguments impliedly falling within the agency or proximate cause theories, respectively, when the trial court denied Tyson's Rule 29 motion with respect to the felony murder count because the evidence demonstrated that L.P.C. was killed during the perpetration of his ongoing assault against Joseph, it implicitly adopted the proximate cause rationale of the People. (J.A. 479-81.)

plice."). Such jurisdictions suggest the foreseeability of the death justifies the broad application of the rule. *See* James W. Hilliard, *Felony Murder in Illinois — The "Agency Theory" vs. the "Proximate Cause Theory"*, 25 S. ILL. U. L.J. 331, 344-49 (2001) (collecting cases). The court in *Redline*, applying the agency theory, also recognized the notion of causation, but compared the liability that attaches where a defendant proximately causes the death of another to the civil law concept of proximate cause liability for negligence, and ultimately rejected application of the proximate cause theory. 137 A.2d at 480-82.

■ Considering the dichotomy of the agency and proximate cause theories of the felony murder rule, the lack of relevant Virgin Islands case law, as well as the absence of any express legislative intent toward either approach in the Virgin Islands, it is useful to consider the origin and evolution of the felony murder rule in this Territory for guidance as to its applicability in this case. "[I]t has long been recognized in this jurisdiction that 'where a Virgin Islands statute is patterned after a statute from another jurisdiction, the borrowed statute shall be construed to mean what the highest court from the borrowed statute's jurisdiction, *prior* to the Virgin Islands enactment, construed the statute to mean.' " *Chinnery v. People*, 55 V.I. 508, 519 n.6 (V.I. 2011) (quoting *V.I. Gov't Hosp. and Health Facilities Corp. v. Gov't of the V.I.*, 47 V.I. 430, 442 (V.I. Super. Ct. 2006)) (emphasis in original); *see also Berkeley v. West Indies Enterprises, Inc.*, 480 F.2d 1088, 1092, 10 V.I. 619 (3d Cir. 1973); *Anthony v. Lettsome*, 22 V.I. 328, 329-30 (D.V.I. 1986).

Title 14, section 922 of the Virgin Islands Code provides, in pertinent part, that:

> (a) All murder which —
> (1) is perpetrated by means of poison, lying in wait, torture, detonation of a bomb or by any other kind of willful, deliberate and premeditated killing;
> (2) is committed in the perpetration or attempt to perpetrate arson, burglary, kidnapping, rape, robbery or mayhem, assault in first degree, assault in the second degree, assault in the third degree and larceny ....
> is murder in the first degree.
> (b) All other kinds of murder are murder in the second degree.

14 V.I.C. § 922. Section 922 was derived from the 1921 Codes. *See* 1921 Codes, Title IV, ch.5, § 2. When the 1921 Codes were repealed in 1957, the

legislature retained all of the former felony murder code provision within section 922 of title 14, with the only amendment noted in the 1957 revision being the addition of "kidnapping" as one of the predicate felonies for felony murder.[12] Although we recognize that a significant portion of the 1921 Codes was borrowed or adapted from The Compiled Laws of the Territory of Alaska of 1913, this is not true of all provisions, in particular, section 922. *See, e.g., Burch v. Burch*, 195 F.2d 799, 805-06, 2 V.I. 559 (3d Cir. 1952); *People v. Charles*, 1 V.I. 201, 211 (D.V.I. 1929) (noting that a large part of the 1921 Code was borrowed, indirectly, from New York). Instead, it can reasonably be inferred that the Virgin Islands, either directly or indirectly,[13] adopted the language used in Section 922 from Pennsylvania, as Pennsylvania was the first state to divide the common law crime of murder into degrees in its Act of 1794, which subsequently served as a basis for similar statutes in other states including New York. *See Redline*, 137 A.2d at 475; *see also Schad v. Arizona*, 501 U.S. 624, 648-49, 111 S. Ct. 2491, 115 L. Ed. 2d 555 (1991) (Scalia, J. concurring); Norval Morris, *The Felon's Responsibility for the Lethal Acts of Others*, 105 U. PA. L. REV. 50, 65 (1956). Accordingly, it is appropriate to look to Pennsylvania's pre-1921 interpretation of its statute for guidance.

The Pennsylvania Act of 1794 provided:

> All murder which shall be perpetrated by means of poison, or by lying in wait, or by any other kind of willful, deliberate and or premeditated killing, or which shall be committed in the perpetration, or attempt to

---

[12] Section 922(a)(2) was amended once more in 2001, again expanding the predicate felonies, this time to include various degrees of assault. *See* Act No. 6493, §1(a) (V.I. Reg. Sess. 2001).

[13] The murder statutes in California and Iowa existing prior to 1921, among others, contained language virtually identical to sections 922(a)(1) and (a)(2) of the Virgin Islands Code. *See People v. Milton*, 145 Cal. 169, 78 P. 549 (1904) ("(1) All murder which is perpetrated by means of poison, or lying in wait, or torture is murder in the first degree. (2) All murder which is perpetrated by any other kind of willful, deliberate, and premeditated killing is murder in the first degree; (3) All murder which is committed in the perpetration of or attempt to perpetrate arson, rape, robbery, burglary, or mayhem is murder in the first degree."); *Iowa v. Moran*, 7 Iowa 236, 238 (1858) ("All murder which is perpetrated by means of poison, or lying in wait, or any other kind of willful, deliberate, and premeditated killing, or which is committed in the perpetration, or attempt to perpetrate, any arson, rape, robbery, mayhem, or burglary, is murder in the first degree . . . ."). Iowa referred to Pennsylvania's statute in construing its code, and California derived its provision from either Pennsylvania, or New York's provision as it stood in 1860, which language mirrored the Pennsylvania statute. *See Milton*, 78 P. at 550; *People v. Bealoba*, 17 Cal. 389, 398 (1861); *Moran*, 7 Iowa at 240.

perpetrate any arson, rape, robbery, or burglary, shall be deemed murder in the first degree; and all other kinds of murder shall be deemed murder in the second degree.

1794 Pa. Laws, ch. 1766, § 2. Although Pennsylvania was the first state to divide the crime of murder into degrees, this Act did not create a statutory crime of murder — rather, it merely codified and categorized the common-law definition of murder, while retaining its substance. *Redline*, 137 A.2d at 474-75. This interpretation also applies to the Virgin Islands murder statute. *See, e.g., Charles*, 1 V.I. at 203 ("The definition of manslaughter given by the Code is merely declaratory of the common law, and is found in section 4 of chapter 5, Title 4 (IV), of the Code (1921; 14 V.I.C. § 924) . . . ."). At common law, murder consisted of three categories (justifiable, excusable, and felonious homicide), with felonious homicide occurring "when a person of sound memory and discretion unlawfully and feloniously kill[ed] any human being in the peace of the sovereign *with malice* prepense or aforethought, express or implied." *Redline*, 137 A.2d at 475 (citing 4 WILLIAM BLACKSTONE, COMMENTARIES *178-86) (emphasis in original). Felony murder was the "accidental or unintentional homicide committed in the perpetration of or attempt to perpetrate a felony" and "the malice necessary to make the killing murder [was] constructively imputed by the malice incident to the perpetration of the initial felony." *Id.* at 475 (citing 4 WILLIAM BLACKSTONE, COMMENTARIES *200-01); *see also State v. Pina*, 149 Idaho 140, 233 P.3d 71, 76 (2010) (tracing English common law understanding of felony murder, highlighting that "the felony murder rule is only properly applied where, at the instant the crime was committed, the charged perpetrators 'were all of the same party, and upon the same pursuit, and under the same engagement and expectation of mutual defense and support with those that did the [crime]' " (citing *R. v. Bosworth*, 99 Eng. Rep. 138-39 (1779))). Because the Act of 1794 did no more than categorize English common law murder, in Pennsylvania, the "basic determination of the fact of murder [was] to be made according to the rules of the common law," which determination included "the felony-murder theory of imputed malice." *Id.* at 476; *see also Commonwealth v. Drum*, 58 Pa. 9, 15-16 (1868) (applying common law definition of murder); *cf. Pina*, 233 P.3d at 77 (addressing a virtually identical felony murder statute, noting that while the statute was silent concerning "whether third persons can be guilty of felony murder, English common law had expanded the felony-murder rule to apply to *only* those acting .

jointly and in concert with the actual killer for the common purpose of the underlying felony") (emphasis added). Hence, the Virgin Islands statute, as it was borrowed from Pennsylvania, also derives its meaning and felony murder interpretation from the common law. *See, e.g.*, 14 V.I.C. § 921 ("Murder is the unlawful killing of a human being with malice afore-thought.").

Early Pennsylvania decisions, presumably applying this understanding of felony murder, indicate that a killing has its inception in the attempt to perpetrate an underlying felony where there is no intervening act that breaks the continuity of events between the attempt or commission of the felony and the murder. *See, e.g., Commonwealth v. Morrison*, 266 Pa. 223, 109 A. 878, 879-80 (1920). This description was later adapted to explain a killing committed "in the perpetration" or *res gestae* of an underlying felony. *See, e.g., Commonwealth v. Kelly*,[14] 333 Pa. 280, 4 A.2d 805, 807-08 (1939); *see also Commonwealth v. Lessner*, 274 Pa. 108, 118 A. 24, 25 (1922) (evaluating whether there was a break in the chain of events); *Commonwealth v. Bodner*, 34 Pa. Co. Ct. Rep. 401, 16 Pa. D. 909, 912-13, 21 York Leg. Rec. 118 (1907) (concurring in conclusion of *State v. Brown*, 7 Or. 186, 206 (1879), the language of which indicates a killing in furtherance of and to prevent the frustration of the underlying felony, committed by the defendant or one of his cohorts, occurred in the perpetration of the felony). Further, in *Commonwealth v. Major*, 198 Pa. 290, 47 A. 741, 743 (1901), the court noted, "If the killing was the probable consequence of the offense in which the appellant and his companions were engaged, the appellant was chargeable even though the killing was done by another *in the execution of the common purpose*." (emphasis added). The language in these earlier cases suggests that Pennsylvania employed the agency theory of felony murder without labeling it as such. This interpretation was confirmed by

---

[14] Citing to 13 R.C.L., p. 845, sec. 148, the court noted:

It may be stated generally that a homicide is committed in the perpetration of another crime when the accused, intending to commit some crime other than the homicide, is engaged in the performance of any one of the acts which such intent requires for its full execution, and, while so engaged, and within the res gestae of the intended crime, and in consequence thereof, the killing results. It must appear . . . that the killing can be said to have occurred as a part of the perpetration of the crime, or in furtherance of an attempt or purpose to commit it.

*Kelly*, 4 A.2d at 807.

the state supreme court's conclusion in *Redline*, that until 1949,[15] "the rule that was uniformly followed [in Pennsylvania], whether by express statement or by implication, was that in order to convict for felony-murder, *the killing must have been done by the defendant or by an accomplice or confederate or by one acting in furtherance of the felonious undertaking.*" *Redline*, 137 A.2d at 476-77 (collecting cases); *see also Stukes v. Shovlin*, 464 F.2d 1211, 1216 (3d Cir. 1972) (applying Pennsylvania law, noting that proof of "common design or concerted action" is needed to "establish causation and to impute malice to the defendant" where a killing is committed by another).

Pennsylvania's application of its felony murder statute is consistent with the reasoning of the majority of other states whose statutes contain similar language. *See Sheriff, Clark County v. Hicks*, 89 Nev. 78, 506 P.2d 766, 768 (1973) (limiting the application of felony murder statute, finding a killing committed by one other than the defendant or an accomplice could not have been committed "in the perpetration" of the felony); *People v. Washington*, 62 Cal. 2d 777, 44 Cal. Rptr. 442, 402 P.2d 130, 132-33 (1965) (same); *see also Campbell v. State*, 293 Md. 438, 444 A.2d 1034, 1042 (1982); *Waller v. United States*, 389 A.2d 801, 807 (D.C. 1978). In *Comer v. State*, 977 A.2d 334, 335-36 (Del. 2009), the state high court upheld the agency approach to Delaware's felony murder statute, reversing a conviction for felony murder where the victim was a bystander killed during a gunfight involving the defendant, because the fatal shot could not be attributed to the defendant or his accomplices. Delaware's felony murder statute originally imposed liability when a person recklessly caused the death of another "[i]n the course of and in furtherance of the commission or attempted commission" of a felony. *Id.* at 338. The court interpreted the language "in the course of and in furtherance of" to require that there be "a causal connection between the felony and the murder" and "that the felon or his accomplices, if any, perform the actual killing." *Id.* at 339. Although at the time of *Comer* the

---

[15] In 1949, the Pennsylvania Supreme Court decided *Commonwealth v. Almeida*, 362 Pa. 596, 68 A.2d 595 (1949), in which the court seemed to apply a proximate cause analysis. The court then restricted its prior holding in *Redline*, reasoning that no case in the state before *Almeida* had ever expanded the felony-murder doctrine to apply in a situation where the killing was committed by a third party acting against the felon. *Redline*, 137 A.2d at 477. *Almeida* was later expressly overruled in *Com. ex. rel. Smith v. Myers*, 438 Pa. 218, 261 A.2d 550 (1970).

statute had been amended to remove this previously dispositive language, given the legislative intent to make the rule more reflective of the common law and more akin to the felony murder statutes in a majority of the states,[16] the court nevertheless upheld the agency theory. *Id.* at 338, 340.

The New York Court of Appeals, adopting the minority view,[17] interpreted an updated version of its statute defining felony murder in pertinent part as where "during the commission"[18] of the felony, the defendant or his accomplice "causes the death of a person other than the participants," as necessitating the proximate cause approach, while simultaneously acknowledging that the language of its former statute mandated the agency approach. *People v. Hernandez*, 624 N.E.2d at 662-63, 666 (the former statute imposed liability for "the killing of a human being . . . by a person engaged in the commission" of the felony).

In *Commonwealth v. Moore*, 121 Ky. 97, 88 S.W. 1085, 1087, 28 Ky. L. Rptr. 62 (1905), the Court of Appeals of Kentucky implicitly upheld the agency theory in affirming the dismissal of an indictment that sought to prosecute two men for the death of a bystander, who was accidentally shot by the person whom the two men were robbing, in resistance to the

---

[16] A majority of states to address the issue have adopted the agency theory of the felony-murder rule. *See, e.g., Campbell*, 444 A.2d at 1037; *Wooden v. Commonwealth*, 222 Va. 758, 284 S.E.2d 811, 816 (1981); *Weick v. State*, 420 A.2d 159, 161-63 (Del. 1980); *State v. Harrison*, 90 N.M. 439, 564 P.2d 1321, 1323-24 (1977); *State v. Rust*, 197 Neb. 528, 250 N.W.2d 867, 875 (1977); *Hicks*, 506 P.2d at 768; *Commonwealth v. Balliro*, 349 Mass. 505, 209 N.E.2d 308, 313 (1965); *State v. Garner*, 238 LA. 563, 115 So.2d 855, 861-64 (1959); *Redline*, 137 A.2d at 482-83; *State v. Oxendine*, 187 N.C. 658, 122 S.E. 568, 570 (1924); *State v. Jones*, 1993 OK CR 36, 859 P.2d 514, 515 (1993); *State v. Severs*, 759 S.W.2d 935, 938 (Tenn. Crim. App.1988).

[17] A minority of states have adopted the proximate-cause theory of the felony murder rule. *See, e.g., People v. Dekens*, 182 Ill. 2d 247, 695 N.E.2d 474, 475, 230 Ill. Dec. 984 (1998); *People v. Hernandez*, 82 N.Y.2d 309, 624 N.E.2d 661, 665, 604 N.Y.S.2d 524 (1993); *State v. Lopez*, 173 Ariz. 552, 845 P.2d 478, 482 (1992); *State v. Baker*, 607 S.W.2d 153, 156 (Mo. 1980); *Mikenas v. State*, 367 So.2d 606, 608 (Fla. 1978); *Sheckles v. State*, 684 N.E.2d 201, 205 (Ind. Ct. App. 1997).

[18] For the first time on appeal, Tyson also argues that the trial court erred in instructing the jury that it must find L.P.C. was unlawfully killed *during* the perpetration or attempt to perpetrate the assault in the first degree against Joseph, rather than tracking the language of the felony murder statutory provision, which punishes murder committed "*in* the perpetration or attempt to perpetrate . . ." certain felonies. 14 V.I.C. § 922(a)(2) (emphasis added). Since we find that the felony murder provision was inapplicable to the facts of Tyson's case, we do not need to reach this claim of error.

robbery. The court reasoned that if either of the defendants, in the commission of the robbery, had fired the fatal shot, both would be liable; however, it would be absurd to hold the defendants responsible for a death not committed in furtherance of their crime, but in efforts to thwart it. *Id.* at 1086. Similarly, in *Weick*, the Supreme Court of Delaware held that the defendants should not have been convicted for the death of their co-conspirator committed by the victim of the felony. 420 A.2d at 163. In coming to its decision, the court noted that "the killing of a co-felon by the victim or a police officer, or the accidental killing of an innocent bystander by the victim or a police officer, can hardly be considered to be 'in furtherance' of the commission or attempted commission of a felony." *Id.* at 162-63; *see also Washington*, 62 Cal.2d at 781 ("When a killing is not committed by a robber or by his accomplice but by his victim, malice aforethought is not attributable to the robber, for the killing is not committed by him in the perpetration or attempt to perpetrate robbery."). Likewise, in *Rust*, in which the defendant and two accomplices committed a robbery and one accomplice was killed during the getaway by a police officer, the court declined to adopt the theory that either of the surviving accomplices could be held liable for the death of their cohort, as he was killed by the police. 250 N.W.2d at 875.

In *State v. Branson*, 487 N.W.2d 880 (Minn. 1992), the court considered a certified question from the trial court in an incident somewhat factually similar to the present case. There, the defendant participated in a gunfight between rival gangs, during which an innocent bystander was killed by a bullet fired from the opposing gang. *Id.* at 881. The Minnesota Supreme Court declined to extend the application of its felony murder rule to hold the defendant liable for the victim's death, noting that "the doctrine of felony murder does not extend to a killing, although growing out of the commission of the felony, if directly attributable to the act of one other than the defendant or those associated with him in the unlawful enterprise." *Id.* at 882 (collecting cases) (internal quotation marks omitted). Although the state's statute had been expanded (as was section 922(a)(2) of the Virgin Islands Code) to incorporate additional predicate felonies, the court held that imputing the *act* of killing was too great an expansion to assume that it was intended by the legislature. *Id.* at 884-85.

■ It appears that elements of the agency theory of felony murder have likewise been implicitly recognized and applied by the few Virgin Islands

courts that have addressed the felony murder statute. In *Carmona*, the Third Circuit Court of Appeals clarified that the malice aforethought required in a felony murder case, "would be inferred from the commission of the felony" and rejected the theory that felony murder could be committed without malice aforethought. 422 F.2d at 100 n.7 (citing 1 WHARTON, CRIMINAL LAW AND PROCEDURE § 251 (1957)). This notion of imputed malice is a well-recognized premise of the agency theory. *See Redline*, 137 A.2d at 476. Also, in *Albert*, the Appellate Division of the District Court of the Virgin Islands upheld the trial court's felony murder jury instruction which stated in part:

> Before you may find the defendant guilty of Murder in the First Degree, that is, Felony Murder, you must first find that the Government has proven each [of] the following essential elements beyond a reasonable doubt: First, *that the defendant either killed Barbara Cromwell or an accomplice of the defendant* killed Barbara Cromwell *while acting in furtherance of the felonious undertaking*; in this case, a burglary. Two, that the killing was without lawful justification . . . .

42 V.I. at 195 (emphasis added). These cases demonstrate that under the Virgin Islands felony murder statute, like Pennsylvania's interpretation of its statute, it is the malice motivating the specified felony that is imputed, and not the act of killing. Accordingly, the defendant or an accomplice must have committed the killing. *See id.*

As was highlighted by the Third Circuit Court of Appeals in *Simmons v. Love*, No. 95-1495, 1996 U.S. App. LEXIS 34786, at *18 n.8 (3d Cir. Oct. 10, 1996) (unpublished),[19] over the years there has been a

---

[19] The Third Circuit granted habeas relief to an appellant that had been convicted of felony murder where the trial court did not instruct the jury that it had to find that the killing, committed by the appellant's accomplice, was done in furtherance of the perpetration of the underlying felony. Specifically, the trial court instructed the jury only that " 'the Commonwealth [must] prove that the killing was done in the course of committing a robbery.' " *Simmons*, 1996 U.S. App. LEXIS 34786, at *10. The Third Circuit found that "specif[ying] that the stabbing had to have been in furtherance of the felony" was a "vital aspect of the point for charge." *Id.* at *20-21. Applying Pennsylvania law, the Third Circuit reasoned that without directing the jury that it must find that the killing was committed in furtherance of the underlying felony, the jury's conclusion could incorrectly be based solely on a finding that the murder was committed during the perpetration of or flight from the crime. *Id.* at *19-20. Tyson's case provokes a similar concern, as the trial court instructed the jury that it must find that L.P.C. was "unlawfully killed during the perpetration or attempt to perpetrate the assault

trend toward adoption of the agency approach due to a concern that broad application of the felony murder rule might result in absurdity — imposing liability where the circumstances do not warrant.[20] *See* Paul J. Arougheti, *Imposing Homicide Liability on Gun Battle Participants for the Deaths of Innocent Bystanders*, 27 COLUM. J. L. SOC. PROBS. 467, 493 n.128 (1994) (discussing the shift toward widespread endorsement of the agency theory) (collecting cases). Also a factor is the concern that the expansion of liability under the proximate cause theory is not compatible with the tenets of criminal law or the historical purpose of the felony murder doctrine to impute only the requisite mental state to the felon.[21] *See, e.g., Campbell v. State*, 293 Md. 438, 444 A.2d 1034, 1041 (1982).

While some states have interpreted the language of their felony murder statutes to allow for the application of the proximate cause theory, such expansion is ultimately a matter for the Legislature if it sees fit or desirable, rather than for the courts. *See State v. Wesley*, 254 Ore. App. 697, 295 P.3d 1147, 1150-53 (2013) (indicating that the legislature controls the scope of the state's felony murder statute); *Davis v. Fox*, 229 W. Va. 662, 735 S.E.2d 259, 265 (2012) (noting that it is presumed the legislature does not intend to change the common law, absent language so indicating — accordingly, in order to expand the application of the felony murder doctrine it must amend the statute); *Pina*, 233 P.3d

---

in the first degree of . . . Joseph[,]" and defined perpetration as "the commission or carrying out of a crime." (J.A. 944.)

[20] As a result of this concern, the felony murder rule was abolished in England, where it originated, in 1957 and in three U.S. states — Hawaii, Kentucky, and Michigan. Martin Lijtmaer, *The Felony Murder Rule in Illinois*, 98 J. CRIM. L. & CRIMINOLOGY 621, 626 n.41 (2008); *see also People v. Aaron*, 409 Mich. 672, 299 N.W.2d 304, 312 (1980).

[21] The only Virgin Islands case to date to discuss the felony murder provision of the Territory in any detail is *People v. Vergile*, 50 V.I. 127 (V.I. Super. Ct. 2008). In *Vergile*, the Superior Court limited the application of the felony murder provision by adopting and applying the merger doctrine, which prohibited the People from "using an assault which [was] 'included in fact' or which [was] an 'integral part' of the [killing] as a predicate felony for the purposes of the . . . statute." *Id.* at 139-40. The court reasoned that to allow an assault that resulted in death to constitute felony murder would eliminate the burden on the prosecution to prove premeditation, and would usurp the distinction between degrees of murder — hence, the court advocated a narrow approach to the felony-murder doctrine. *Id.* As we have determined that Tyson's felony murder conviction is not sustainable under the facts of this case, we will not consider whether the first-degree assault was an appropriate predicate felony, nor will we evaluate the Superior Court's adoption of the merger doctrine. We note that *Vergile* was affirmed in *Vergile v. People*, 54 V.I. 455 (V.I. 2010); however, the merger doctrine issue was not before this Court on that appeal.

at 78 (any change to the application of the agency theory to felony murder "lies in the province of the legislature"); *Hernandez*, 624 N.E.2d at 664 (acknowledging that contrary intent by the legislature could change the court's interpretation of the felony murder statute); *Redline*, 137 A.2d at 474 ("If predominate present-day thinking should deem it necessary to the public's safety and security that felons be made chargeable with murder for *all* deaths occurring in and about the perpetration of their felonies — regardless of how or by whom such fatalities came — the legislature should be looked to . . . ."). Here, the Virgin Islands Legislature has not seen fit to change the historical common law interpretation of the felony murder rule; unless the Legislature indicates otherwise, this Court will not presume a different construction of the statute.

█ We therefore conclude that section 922 of title 14, as it has remained substantially unchanged since its adoption in 1921, is limited by the agency theory of the felony murder rule. Consequently, under section 922, Tyson may only be held liable for L.P.C.'s death if she was killed by Tyson or an accomplice in carrying out the assault on Joseph.

According to Perez Mendez's testimony, he and his family, including L.P.C., were near Coki Point Beach on the date and time in question, leaving the area in a safari taxi, and were stopped due to traffic when he heard gunshots. (J.A. 439-440, 445-47.) He described ducking down, looking back, and seeing a person inside a red car firing shots at another person walking by; when they got up from the floor of the safari, his daughter said she had been hit. (J.A. 448-50.) Penn testified that after Tyson shot Joseph, two men were shooting back at Tyson, and that this occurred "after [Tyson] came up behind the safari." (J.A. 129.) Nonetheless, the testimony of Dr. Landron, the medical examiner, demonstrates that L.P.C. was killed by a .38 caliber projectile, and the testimony of Detective Lans confirms that no .38 caliber spent bullet casings were discovered at the scene. (J.A. 197, 312-17, 324.) Moreover, Penn and others indicated that Tyson was acting alone, the evidence did not suggest he had an accomplice during the shooting, and he was charged in the Information with felony murder alleging L.P.C. was killed by *return gunfire* — rather than claiming Tyson himself or an accomplice fired the

shot that killed her.[22] (J.A. 13.) Thus, while factually, it would not be error for a jury to determine that a gunshot associated with Tyson's altercation struck and killed L.P.C. and that she was shot as a result of the gunfire exchanged between Tyson and the other men, it was legal error to find that L.P.C. was killed "in the perpetration" of Tyson's first-degree assault against Joseph, given the historical interpretation we find applicable to section 922. Accordingly, despite the policy rationale that might support holding a person who initiated a gunfight in a crowded, public street liable for the death of an innocent bystander that occurred in the process, we are forced to reverse Tyson's conviction for felony murder as charged under count 5.

### 3. Reckless Endangerment

In the context of his reckless endangerment conviction, Tyson asserts on appeal that the record did not identify a victim — as he interprets to be required by section 625(a) of title 14 — and that as a result, the record is not adequate for this Court to determine the sufficiency of the evidence surrounding the conviction.[23] (Appellant's Br. 35-36.) He argues that if the People were claiming there were multiple victims, they were required to charge separate counts naming each victim. (*Id.*)

"A person is guilty of reckless endangerment in the first degree when, under the circumstances evidencing a depraved indifference to human life, he recklessly engages in conduct in a public place which creates a grave risk of death to another person." 14 V.I.C. § 625(a). In *Augustine v. People*, 55 V.I. 678 (V.I. 2011), where the defendant was charged with and found guilty of *a single* count of reckless endangerment, *id.* at 681, this Court found testimony that the defendant fired a gun at three police officers in a public street was sufficient to allow the jury to

---

[22] Although all of the testimony concerning Tyson's use and possession of a firearm indicate that he was using a 9 millimeter gun, considering the evidence connecting Tyson with the weapon emerged during the presentation of the defense, rebuttal, and/or testimony of Cooper, all of which took place after the court considered Tyson's Rule 29 Motion, we will not consider this evidence as it relates to his sufficiency argument for felony murder. However, given the testimony that Tyson was seen firing a gun at Joseph, and that Joseph was shot by a 9 millimeter gun, a jury could infer that Tyson used a 9 millimeter gun.

[23] Tyson also makes a similar claim about his assault conviction; however, as indicated earlier, we decline to review that conviction due to the Superior Court's decision to merge it into his conviction for the murder of Joseph, which we affirm in full.

conclude that that he created a grave risk of death to those officers, "as well as any other members of the public that were in the area at the time." *Id.* at 689 ("[T]he act of firing a loaded gun at or near someone is, by definition, the epitome of reckless conduct creating a grave risk of death under circumstances evincing an extreme indifference to human life." (quoting *State v. Coward*, 292 Conn. 296, 972 A.2d 691, 702-03 (2009))). Furthermore, we agree with the Appellate Division of the District Court that

> [b]y its plain terms, the statute [section 625(a)] requires only a showing that the conduct was done in a place that is open to the public or where the public has a right to be, thereby posing a risk of death to *members of the public who may be in the area.*

*Alcindor v. Gov't of the V.I.,* D.C. Crim. App. No. 2004/84, 2006 U.S. Dist. LEXIS 88212, at *11 (D.V.I. App. Div. Nov. 28, 2006) (unpublished) (emphasis added). Accordingly, reckless endangerment may be established based on the conduct of the defendant in a place where the public has the right to be — it does not hinge on the naming of a particular or finite number of endangered persons. *See Augustine,* 55 V.I. at 689; *Mulley,* 51 V.I. at 412; *Alcindor,* 2006 U.S. Dist. LEXIS 88212, at *11.

In this case, the evidence, viewed in the light most favorable to the People, established that Tyson opened gunfire on Joseph as he walked with others down the public road toward the burial procession taking place nearby. (J.A. 91-94.) Several witnesses indicated that the area was crowded that day from tourists visiting the neighboring underwater observatory and beach, as well as from parked cars and persons headed to the burial service. (J.A. 133-38, 150.) Witnesses mentioned the congested traffic on the road that day, as well as the presence of two open-air safari taxis with passengers, and Penn observed the shooting take place on a public road, which he saw while sitting in his front yard with his family, ten to twelve feet from the scene. (J.A. 73-74, 76.) Several witnesses attested to hearing shots fired by a man in a red car out of his passenger window, and to seeing a man fall down who, only moments before, had been walking in the road with a couple of other people. (J.A. 91-94, 155, 448.) Further, several witnesses testified that others fired shots in return at Tyson, and that there were several guns in play. (J.A. 96-97, 126, 278-79, 286, 289.)

■ Unquestionably, reckless conduct that endangers people generally, in a public place, is sufficient for a finding of reckless endangerment. *See Augustine*, 55 V.I. at 689; *Mulley*, 51 V.I. at 412; *Alcindor*, 2006 U.S. Dist. LEXIS 88212, at *11. Moreover, the Information in this case placed Tyson on notice as to which persons were endangered by his actions. (J.A. 14 ("[Tyson] recklessly engaged in conduct in a public place which created a grave risk of death to another, to wit: he opened fire at a funeral near a beach where many mourners and tourists were present."). ) In light of the charge and the testimony presented, the record is sufficient to facilitate a meaningful review of the reckless endangerment conviction, and we do not hesitate in holding that the People introduced sufficient evidence to sustain that conviction.

### C. Prior Conviction Evidence

Tyson also argues that the Superior Court erred in allowing evidence of his prior conviction to be used substantively in the case. Specifically, Tyson asserts that the trial court erroneously instructed the jury that "they could consider [his] prior conviction to help them decide whether [he] was the one who shot Mr. Joseph . . . . [and] to help them decide whether [he] was guilty of the other charges in the information." (Appellant's Br. 18.) Further, Tyson claims the prosecutor's frequent reference to identity as the key question in this case during closing arguments deprived him of a fair trial. During oral argument, Tyson's counsel asserted that the evidence, in the form of the testimony of Detective Lans and Cooper, could have been submitted under Federal Rule of Evidence 404(b), but that the manner in which the evidence of the conviction was submitted during rebuttal was improper. We address each claim in turn.

#### 1. Admissibility of Prior Conviction Under Rule 609

Tyson contends on appeal that introducing his prior third-degree assault conviction for impeachment purposes was more prejudicial than probative due to the similarity of the crimes and lack of relation of the assault crime to his character for truthfulness, although he did not object to its introduction at trial. (J.A. 609-09.)[24] Accordingly, we would

---

[24] Defense counsel objected to the admission of a certified copy of the conviction as an exhibit because Tyson had already admitted to the conviction, but he did not object to the use of the prior conviction to impeach Tyson's credibility. (J.A. 609-10.)

ordinarily review for plain error. *See Phipps*, 54 V.I. at 546. However, while Tyson disputes the probative value of the evidence, his primary issue on appeal is that the subsequent use of the conviction went beyond what is considered permissible under Rule 609 of the Federal Rules of Evidence.[25]

 A defendant who chooses to testify places his credibility at issue, as it is a basic function of the jury to determine the credibility of each witness. *See Prince v. People*, 797 F. Supp. 2d 640, 648, 55 V.I. 1026 (D.V.I. App. Div. 2011). Rule 609(a)(1)(B) of the Federal Rules of Evidence provides that when attacking a witness's character for truthfulness, where that witness is also the defendant, a prior felony conviction must be admitted if the probative value outweighs the prejudicial effect on the defendant. FED. R. EVID. 609(a)(1)(B).

 When Tyson took the stand and testified, he placed his credibility at issue. Although the similarity between the crimes charged and his prior conviction no doubt enhanced its potential prejudicial effect, the trial court reasoned that as Tyson "specifically denied ever owning, possessing[,] or firing a firearm[,]" the People could inquire as to whether he was previously convicted of third-degree assault, and whether he was convicted of firing a firearm in that case.[26] (J.A. 608-09.) Importantly, Rule 609(a)(1) does not limit admission to those crimes involving

---

[25] The Federal Rules of Evidence were made applicable to the court in 2010 by the enactment of section 15(b) of Act No. 7161 of the Virgin Islands Legislature. *See Christopher v. People*, 57 V.I. 500, 507 (V.I. 2012).

[26] In *United States v. Jimenez*, 214 F.3d 1095, 1099 (9th Cir. 2000), the United States Court of Appeals for the Ninth Circuit reversed a conviction where the trial court caused the defendant's prior conviction of assault with a deadly weapon to be referred to as a "felony involving a firearm." The main issue in the case was whether the defendant possessed a firearm; thus, the reference to a felony involving a firearm, rather than simply a deadly weapon, was deemed prejudicial and not harmless. *Id.* Further, the committee notes to Rule 609(a) indicate that "denials or other representations by the defendant regarding the specific conduct which forms the basis of the charge against him shall not make prior convictions admissible to rebut such statement." FED. R. EVID. 609 Notes of Committee on Judiciary, Senate Rep. No. 93-1277. Here, once Tyson testified that he had never fired a gun, the trial court permitted the People to ask specifically whether he had been convicted of firing a firearm, rather than limiting the inquiry to whether he had been convicted of third-degree assault — assault with a deadly weapon. (*See* J.A. 608-09.) Nonetheless, any prejudicial effect resulting from this reference was outweighed by the probative value of the evidence. Further, the record indicates that Tyson was convicted of a firearms charge in conjunction with the third-degree assault, which would cause reference to the firearm anyway. Moreover, even if we were to find the convictions were improperly presented, the reference was still harmless

dishonesty or false statements; rather, this section of the rule allows for impeachment, within the discretion and balancing of the court, based on the fact that the prior conviction was a felony — evidence that a defendant has been convicted of a felony is probative as to that defendant's credibility. *See* FED. R. EVID. 609 advisory committee's notes. Further, considering that Tyson's testimony directly contradicted the prior conviction evidence, it was particularly probative as to his credibility in this case. Moreover, Tyson's credibility was also significant to the outcome of the trial, given that he was the only witness to suggest that he was a victim rather than an aggressor. *See Gov't of the V.I. v. Bedford*, 671 F.2d 758, 761 n.4, 19 V.I. 641 (3d Cir. 1982) (highlighting the importance of the defendant's testimony and credibility as relevant considerations when determining admissibility of a prior conviction under Rule 609(a)(1)); *see also United States v. Greenidge*, 495 F.3d 85, 97-98 (3d Cir. 2007); *United States v. Nururdin*, 8 F.3d 1187, 1192 (7th Cir. 1993). Accordingly, despite the similarities between the prior conviction and the crimes for which Tyson was on trial at the time, we find the court did not err in allowing Tyson's prior conviction to be introduced, as the jury should have "as much relevant evidence on the issue of credibility as possible." *See* FED. R. EVID. 609 advisory committee's notes.

 While courts have consistently limited the information that may be introduced under Rule 609 regarding a defendant's prior conviction to only "the crime charged, the date, and the disposition," and have found it improper to elicit details of the crime underlying the conviction being used to impeach, *see, e.g., United States v. Howell*, 285 F.3d 1263, 1267 (10th Cir. 2002) and *Gora v. Costa*, 971 F.2d 1325, 1330 (7th Cir. 1992), Rule 609 does not preclude the use of evidence of a prior conviction under Rule 404(b).[27] *See United States v. Baldarrama*, 566 F.2d 560, 567-68 (5th Cir. 1978); *see also United States v. Flood*, 339 Fed. Appx.

---

given the trial court's decision to allow evidence of Tyson's prior conviction, including reference to the firearm, to be admitted to prove identity under Rule 404(b). *See* V.I.S.CT.R. 4(i).

[27] Although not raised by the parties, Tyson's December 6, 2010 third-degree assault conviction case is currently pending appeal with this Court. Nonetheless, Rule 609(e) of the Federal Rules of Evidence allows impeachment of a witness by a conviction that is being appealed, and Rule 404(b) does not require a defendant to have been convicted or even charged with the prior crimes or acts used against him. "Rule 404(b) is not limited to evidence of other crimes which resulted in convictions, although a conviction no doubt facilitates proof of the other offense. The fact that charges on a prior crime are dismissed is without independent significance in applying Rule 404(b)." *United States v. Juarez*, 561 F.2d 65, 70

210, 214 (3d Cir. 2009); *United States v. Schwartz*, 315 Fed. Appx. 412, 418-19 (3d Cir. 2009).

## 2. *Admissibility of Prior Conviction Evidence Under Rule 404(b)*

During the People's rebuttal, Detective Lans gave testimony concerning Tyson's December 6, 2010 third-degree assault conviction case demonstrating that the 9 millimeter spent bullet casings recovered from that crime scene were fired from the same gun as the 9 millimeter spent bullet casings recovered in the present case. (J.A. 734-39, 821.) Cooper testified at this time concerning the matching bullet casings as well. Detective Lans also testified to photographing the red Honda car when it returned to the scene of the prior assault case. (J.A. 734-39.) Defense counsel objected, unsuccessfully, prior to and during the rebuttal testimony of Detective Lans and Cooper.[28] (J.A. 725-26, 730, 735.)

Although overruling the objections, before Detective Lans's testimony the court instructed the jury as to the limited purpose of the prior conviction evidence. Specifically, the court stated:

> Ladies and Gentlemen, you are about to hear testimony that certain physical evidence was collected at the scene of the crime with which the defendant was previously convicted of committing, and testimony that the evidence from the previous crime was compared with evidence in this case. That testimony may be considered by you for the limited purpose of determining the *identity* of the person who committed the crimes charged in the first amended superseding informa-

---

(7th Cir. 1977). Similarly, Rule 803(22), which allows for the use of a felony conviction to prove facts necessary to the conviction, also provides that the pendency of an appeal does not affect admissibility, under the theory that "sufficient reliability flows from a conviction of a serious offense at the [t]rial [c]ourt level." FED. R. EVID. 803(22) cmt. (Steven A. Saltzburg et al., Judgments in Felony Cases). The fact that a conviction is pending appeal goes to the weight of that evidence, and while the rules permit the use of this fact for that purpose, they do not mandate that the jury be instructed of such, and the defense counsel in this matter did not raise the issue. *See* FED. R. EVID. 609 advisory committee's note (stating the pendency of an appeal is "a qualifying circumstance properly considerable").

[28] Defense counsel reasoned that allowing the testimony was a violation of Rule 609 of the Federal Rules of Evidence, although counsel did not object to the admission of exhibits 80 and 81 — a photo of two cartridge casings from the Coki Beach homicide taken on a comparison microscope by Cooper, and a photo of "two []9 millimeter fired cartridge casing[s]. One . . . from the Coki Beach homicide, [and] the other . . . from [Tyson's previous assault case]." (J.A. 822.)

tion in this case, and for no other purpose. You may consider the evidence only to help you decide whether the People have proven the identity of the defendant as the perpetrator of the crimes charged in this case.

(J.A. 730-31 (emphasis added).) During closing arguments, the People emphasized that identity was central to this case, making several statements such as "the key question in this case is who fired this [9] millimeter bullet." (*See, e.g.*, J.A. 844, 852-54, 859-60, 873, 876-77.) The court reiterated its direction as to the limited purpose of the evidence in its final instructions to the jury, stating that the testimony comparing evidence from Tyson's prior case to the present case was only to be used to determine identity. (J.A. 935.)

 Rule 404(b)(2) allows the admission of evidence of crimes,[29] wrongs, or other acts for non-propensity purposes, "such as proving

---

[29] In his appellate brief, Tyson distinguishes between "evidence of a prior conviction" and "evidence of prior crime" arguing that the former is not evidence of the facts that make up the crime, but rather is only evidence of the conviction itself. (Appellant's Br. 22.) Accordingly, he asserts that "evidence of a prior conviction" cannot be used under Rule 404(b) as evidence of a prior crime, because it does not consist of substantive evidence. *Id.* Counsel elaborated during oral argument, suggesting that the testimony of Detective Lans and Cooper was permissible under Rule 404(b), but that use of the conviction amounted to hearsay because it relied on the finding of another jury. It is counsel's argument that, instead, a witness from the prior crime needed to testify that Tyson possessed or fired the weapon in the previous case, rather than submitting the finding of guilt by a jury.

When the trial court initially considered whether to admit the evidence, it raised the issue of how the People intended to connect the evidence from the prior incident to Tyson, noting that Cooper was not a witness. (J.A. 37-38.) The People responded that Detective Lans could testify that Tyson returned to the scene in the same car as used in the current crime, but there was only one eyewitness that could say "Tyson is the one that fired at me or is the one that fired that gun that day." (J.A. 38-39.) Later, the People addressed the court's question again, stating that the conviction was evidence that Tyson was the person who fired the shots and no further identification was necessary. (J.A. 622-23.) Defense counsel did not challenge this contention, but instead indicated that his biggest issue was determining when the casings were found, which the court gave him wide latitude to explore. (J.A. 626-29.)

Final judgments and convictions are an exception to the hearsay rule. Rule 803(22) allows for the use of evidence of a final judgment or conviction to prove any fact essential to that judgment. The annotation for Rule 803(22) cites to *United States v. Wilkerson*, 548 F.2d 970, 179 U.S. App. D.C. 15 (1976), in which the prosecution explored details of a defendant's prior conviction during cross-examination. There, the court held that "[e]vidence of prior crimes is admissible not merely for impeachment of a witness, but as affirmative evidence of the crime under prosecution." *Id.* at 972. We find Tyson's distinctions between "prior convictions" and "prior crimes" and his argument surrounding the distinction unpersuasive.

motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." FED. R. EVID. 404(b)(2). In *Huddleston v. United States*, 485 U.S. 681, 691-92, 108 S. Ct. 1496, 99 L. Ed. 2d 771 (1988), the United States Supreme Court laid out four requirements to consider in evaluating whether evidence is properly admitted under Rule 404(b). Namely, (1) the evidence must be offered for a proper purpose, (2) the evidence must be relevant under the standards of Rule 402, (3) its probative value must not be substantially outweighed by its potential for unfair prejudice pursuant to Rule 403, and (4) where requested the court must instruct the jury to consider the evidence only for its limited admissible purpose. *See id.*; *Chinnery v. People*, 55 V.I. 508, 526 (V.I. 2011); *United States v. Kellogg*, 510 F.3d 188, 199 n.10 (3d Cir. 2007). The trial court's ruling under Rule 404(b) "may be reversed only when [it] is clearly contrary to reason and not justified by the evidence." *United States v. Balter*, 91 F.3d 427, 437 (3d Cir. 1996) (some internal quotation marks omitted).

■ The first two considerations of the four-part analysis are met where the proffered evidence is "probative of a material issue other than character." *United States v. Cross*, 308 F.3d 308, 320-21 (3d Cir. 2002). Relevant evidence may be excluded where its probative value is substantially outweighed by a danger of unfair prejudice. FED. R. EVID. 403. A prejudicial effect is not "unfair" simply because the evidence is adverse to the position of a party, but rather, it must have an "undue tendency to suggest decision on an improper basis. . . ." FED. R. EVID. 403 advisory committee's note. *See also Mulley*, 51 V.I. at 411-12 ("The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged."); *Krepps v. Gov't of the V.I.*, 47 V.I. 662, 674 (D.V.I. App. Div. 2006) ("Unfair prejudice is measured by the degree to which a jury responds negatively to some aspect of the evidence unrelated to its tendency to make a fact in issue more or less probable."). In the context of Rule 404(b), the concern is whether the value of using the evidence for one of the permissible purposes is substantially outweighed by the possibility the jury will use the evidence as proof of bad character. FED. R. EVID. 404 advisory committee's note.

■ Because there is a presumption in favor of admitting relevant evidence, this Court has opined that "judicial restraint is . . . desirable"

when reviewing a trial court's ruling under Rule 403. *Francis v. People*, 56 V.I. 370, 385-86 (V.I. 2012); *see also McCarty v. Pheasant Run, Inc.*, 826 F.2d 1554, 1559 (7th Cir. 1987) (discussing that where a trial judge explains his rationale behind a 403 determination, that determination will "rarely be overturned"). Hence, a trial court's Rule 403 ruling is afforded great deference. Furthermore, careful limiting instructions to the jury have been held to mitigate the potential prejudice arising from evidence deemed admissible following a Rule 403 balancing. *See United States v. Gelzer*, 50 F.3d 1133, 1139-40 (2d Cir. 2006).

In deciding to allow the evidence of Tyson's prior conviction, the court, in its instruction to the jury, specifically indicated that the evidence was to be considered only in determining the identity of the person who committed the crimes. (J.A. 622-630, 730-31.) Furthermore, prior to the start of trial, the court observed that the evidence was "probative as to identity," and that it was "inclined to permit it," but reserved its decision contingent on what occurred during the defense's presentation of their case. (J.A. 40-42.) When he took the stand, Tyson testified that he was at the scene at Coki Point, but that he did not own a gun and had never fired a gun before, thereby contesting his identity as the shooter. As noted in *Cross*, evidence linking Tyson to the weapon used to kill Joseph was thus probative of a fact other than character, satisfying the first and second considerations laid out in *Huddleston* — proper purpose and relevance. 485 U.S. at 691-92.

The third consideration under *Huddleston* is whether the potential for prejudice substantially outweighs the probative value of the evidence. *Id.* Here, the Superior Court appears to have engaged in a thoughtful reasoning process before allowing the evidence to be introduced. When the motion to admit the evidence was initially discussed, the court first assessed whether the defense contested the element the evidence was intended to prove. (J.A. 32-42.) It then had the People explain how they intended to introduce the evidence and how they intended to tie the firearm bullet casings to Tyson. (*Id.*) The court then weighed several scenarios where it would be an error to introduce such evidence and opined that this case was unlike those situations, but also noted that it may be more prejudicial but not necessarily more probative if the defense was not contesting the identity of Tyson as being on the scene, but rather only contesting his identity as the shooter. (*Id.*) The court then, after noting that it was inclined to permit the evidence, declined to do so in the People's

case-in-chief, opting to wait and see how the trial progressed. (*Id.*) These actions suggest that the court conducted a thorough balancing of the potentially prejudicial and probative values of the evidence, as required under Rule 403. *See People v. Todmann*, S. Ct. Crim. No. 2009-0052, 2010 V.I. Supreme LEXIS 12, at *18-23 (V.I. Feb. 19, 2010) (unpublished) (discussing the 403 balancing process).

Before the court ruled, the People went through each of the factors highlighted in *Huddleston*, articulating the probative value of the evidence as follows: "[Tyson] fired a [9] millimeter that resulted in casings. That same [9] millimeter was at Coki Beach . . . . we'll show [] identity through the fact that he was there, and the gun that was in his possession just ten days prior was also there." (J.A. 624-25.) They argued that the evidence would not be overtly prejudicial because Tyson had already admitted to the conviction, and further, that the conviction was proof that Tyson fired the gun in the previous case, thereby connecting him to the earlier bullet casings, a link the establishment of which had been an earlier concern of the court. (J.A. 625.) The court determined that the evidence was relevant and admissible, but also stated that the defense would be allowed to challenge the evidence where the opportunity presented itself. (J.A. 627, 629.) The court also reviewed each question the People planned to ask Detective Lans prior to his testimony. (J.A. 721-26.)

Furthermore, the evidence from Tyson's prior conviction was not presented in an unduly prejudicial manner. Detective Lans laid the foundation for the evidence, testifying that he collected the bullet casings from the previous case and also photographed Tyson's vehicle when it returned to that scene. (J.A. 734-39.) Cooper then testified that he compared those bullet casings from the prior case with the 9 millimeter bullet casings from the current case, and concluded that they were all fired from the same firearm. (J.A. 821.)

In reaching our decision, we emphasize that the People did not put forward extraneous details about the commission of the prior crime, and Tyson was actually convicted of the prior assault involving the gun in question. The evidence was certainly prejudicial — as is all evidence introduced to prove a defendant's guilt — but Rule 404(b) seeks to preclude only evidence that is *unfairly* prejudicial, causing the jury to declare guilt based on grounds unrelated to the proof of elements in the case. Considering the manner in which the evidence was presented and

the limiting instructions given to the jury, the trial court was correct in determining that the likelihood that the jury would use the evidence improperly was outweighed by the probability that the jury would use the evidence for a non-character purpose, as instructed by the court. *See Gelzer*, 50 F.3d at 1139-40 (emphasizing the substantial probative value of evidence linking the defendant to the weapon in question).

The final *Huddleston* factor is whether the court instructed the jury as to the limited permissible use of the evidence. 485 U.S. at 691. Here, upon defense counsel's argument that the evidence would be misused for propensity purposes, the court responded that it would give a limiting instruction — which it did, both prior to the introduction of the evidence and again during the final instructions — stating that the evidence was to be used only in determining the identity of the person who committed the crimes charged in this case. *See United States v. Akouavi Kpade Afolabi*, 508 Fed. Appx. 111, 115-116 (3d Cir. 2013) (finding instruction limiting use of prior bad acts evidence to determining the existence of a scheme, plan, intent, or absence of mistake sufficient) (unpublished); *United States v. Snard*, 497 Fed. Appx. 228, 233 (3d Cir. 2012) (holding admission of prior conviction under Rule 404(b) appropriate where it was necessary to prove knowledge and a limiting instruction was given).

 It is evident that the rebuttal testimony comparing ballistics evidence from Tyson's December 6, 2010 third-degree assault conviction case with ballistics evidence in the present case was admitted for a non-character purpose — to prove identity. From the record, it is clear that the court properly considered the relevant factors and that it weighed those factors prior to making its decision to admit the evidence; a balancing process to which this Court affords great deference. *Francis*, 56 V.I. at 385-86. We therefore conclude that the trial court did not act in a manner clearly contrary to reason and unsupported by evidence, and thus uphold the trial court's ruling, admitting the evidence of the prior conviction to prove identity.[30]

---

[30] Because the evidence of Tyson's prior conviction was properly admitted under Rule 404(b), this Court does not need to address Tyson's contentions that the court improperly instructed the jury, and that the prosecutor's statements regarding identity during closing arguments amounted to misconduct.

## D. Jury Instructions

On appeal Tyson also raises several arguments against the jury instructions given by the court. Based on our above holdings, it is not necessary for us to reach the merits of any of these jury instruction challenges, except for Tyson's claim that the trial court erred in failing to instruct the jury that it must find that the firearm Tyson possessed was operable in order to convict him of unauthorized use of a firearm during the commission of a crime of violence under section 2253(a). (Appellant's Br. 34.) Importantly, in *Fontaine v. People*, 56 V.I. 660 (V.I. 2012), this Court held that section 2253(a) does not require that the People prove a firearm was operable.

> Section 2253(a), by its plain language, criminalizes the possession of any unauthorized firearm *or imitation thereof* during the commission of a crime of violence. By its use of the phrase "imitation thereof," the statute clearly criminalizes the possession of an item which appears to be a firearm, even if it is incapable of discharging ammunition, when it is possessed during a crime of violence. Thus . . . it is irrelevant whether a "firearm or imitation thereof" is actually "capable of discharging ammunition" when the implement is possessed during the commission of a crime of violence.

*Id.* at 670 (internal quotation marks and citations omitted). Thus, the operability of the firearm is irrelevant to the charge, and we therefore conclude that the Superior Court did not err in neglecting to instruct the jury that it had to find that the firearm was operable.

## E. Tyson's Sentence

Finally, although not raised as an issue on appeal, we cannot ignore that the Superior Court failed to comply with Virgin Islands law when it imposed separate sentences for two counts of unauthorized use of a firearm during a crime of violence. Section 104 of title 14 of the Virgin Islands Code, which affords greater protections than the Double Jeopardy Clause of the United States Constitution, *see Galloway v. People*, 57 V.I. 693, 712 (V.I. 2012), provides that

> An act or omission which is made punishable in different ways by different provisions of this Code may be punished under any of such provisions, but in no case may it be punished under more than one. An

427

acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other.

14 V.I.C. § 104. Thus, "[t]he plain language of section 104 indicates that despite the fact that an individual can be charged and found guilty of violating multiple provisions of the Virgin Islands Code arising from a single act or omission, that *individual* can ultimately only be punished for one offense." *See Galloway*, 57 V.I. at 712 (quoting *Williams v. People*, 56 V.I. 821, 832 (V.I. 2012)). While Tyson failed to lodge a contemporaneous objection during the Superior Court proceedings or to raise this issue in his appellate brief, "we have already held that a complete failure by the Superior Court to apply section 104 will typically satisfy all four prongs of the plain error standard of review." *Rawlins v. People*, 58 V.I. 261, 276 (V.I. 2013) (citing *Williams*, 56 V.I. at 832-34).

 In this case, Tyson was sentenced for two counts of unauthorized use of a firearm during a crime of violence — one count pertaining to the murder of Joseph, the other count pertaining to the murder of L.P.C. Notwithstanding the fact that we have determined there was insufficient evidence to sustain Tyson's conviction for felony murder — which would eliminate the sentencing enhancement on that weapons count, *see Ambrose v. People*, 56 V.I. 99, 105 (V.I. 2012) (citing *Pearson v. State*, 64 So.3d 569, 577 (Miss. Ct. App. 2011)) — the crime of possession under the facts of this case was a single act. The record contains no evidence that Tyson used multiple firearms, and instead indicates that he possessed the same firearm throughout the duration of the shooting incident. Although there were arguably two victims of Tyson's crime of possession, considering possession itself is the crime prohibited by section 2253(a) — independent of any crime of violence[31] — we do not find that each count of possession was committed against at least one different victim, so as to warrant separate sentences. *See People v. Masters*, 195 Cal. App. 3d 1124, 241 Cal. Rptr. 511, 512 (1987) (applying California sentencing provision after which section 104 of title 14 of the Virgin Islands Code was modeled). In *Masters*, the court upheld the defendant's sentence under

---

[31] While section 2253(a) allows for imposition of punishment for possession of a weapon during a crime of violence in addition to that which is imposed for the underlying crime of violence, this exception does not address the imposition of multiple punishments for the same act of possession.

two statutory provisions for conduct derived from the same act of firing a gun at a vehicle — one person was actually hit by the bullet, and so was a victim of a separate crime, and that individual and two others were collectively the victims of the discharge of the firearm at the vehicle, as they were all passengers — notably, the defendant was not sentenced for separate counts of discharging the weapon for each passenger. *Id.* at 513. Accordingly, we remand this matter to the Superior Court with instructions to sentence Tyson for only one firearm conviction, and to stay execution of his sentence for the remaining conviction.[32] *See Williams*, 56 V.I. at 832 n.8.

## III. CONCLUSION

For the foregoing reasons, we affirm Tyson's convictions except for the felony murder conviction on count 5 which we reverse, and remand this matter to the Superior Court for resentencing consistent with section 104 of title 14.

---

[32] Tyson also argued in his appellate brief that there was insufficient evidence that he committed the crimes of violence associated with each firearms charge. Although we have reversed Tyson's conviction for one of the "crimes of violence" — felony murder — as noted in *Ambrose*, 56 V.I. at 105, section 2253(a) " 'prescribes a single offense of unauthorized possession of which there are [only] two elements: one, that the defendant possessed a firearm and two, that the defendant [possessed] it without authorization of law.' " That possession occurred during a crime of violence is only a sentencing enhancer. Because we sustain Tyson's first-degree murder conviction, which constitutes one crime of violence, and also remand based on section 104, we need not consider the sufficiency of the evidence to sustain the firearms charges at this time.